UNITED STATES of America, Plaintiff,

v.

Barry Buckman WHITLOCK, Defendant.

Crim. No. 5–80643.

United States District Court,
E. D. Michigan, S. D.

July 30, 1976.

Robert D. Sharp, Asst. U. S. Atty., Detroit, Mich., for plaintiff.

James C. Thomas, Royal Oak, Mich., for defendant.

## MEMORANDUM OPINION AND ORDER

KEITH, Chief Judge.

This matter is before the Court on defendant's Motion to Suppress Evidence filed pursuant to Rule 41(e) of the Federal Rules of Criminal Procedure. The defendant has been charged in a two-count Indictment with possession with intent to distribute cocaine, a Schedule II Narcotic Drug Controlled Substance and with unlawful importation of cocaine in violation of 21 U.S.C. Section 841(a)(1) and 21 U.S.C. Section 952(a). An evidentiary hearing was held on this matter to determine the relevant facts.

On April 15, 1975, Special Agent Keith Baudoin of the Drug Enforcement Administration obtained a search warrant to search the apartment of defendant Barry Whitlock at 5625 Parview Drive, Apartment 307, Clarkston, Michigan. The warrant was supported by the affidavit of Agent Baudoin which stated that two manilla envelopes containing suspected cocaine, addressed to Mike Kempton, PHD, c/o 5625 Parview, Apt. 307, Clarkston, Michigan, would be delivered to the addressee in the normal course of the mail for the purpose of making a controlled delivery. The affidavit further stated that the envelopes, bearing the return address Univ. de Bogota, Depto. DeAgricola, CL234–47, Bogota, Colombia, had been intercepted in New York at which time a Customs examination of the contents revealed the presence of cocaine in each envelope.

Agent Baudoin testified that at approximately 8:15 P.M. in the course of executing the warrant, he observed the defendant park a vehicle and proceed through the front door of the apartment building. At approximately 8:25 P.M., Agent Baudoin observed the defendant exit the front door of the building and enter the same vehicle. At this point, Agent Baudoin, with his gun drawn and pointed at the defendant, got out of his vehicle and approached the defendant. Agent Baudoin detained the defendant, having been advised by other DEA agents who were stationed in the building that the defendant had picked up the two packages containing cocaine which had been delivered to defendant's mailbox earlier as part of the controlled delivery.

Agent Baudoin testified that he proceeded to place the defendant in handcuffs because the defendant was being belligerent and Agent Baudoin was concerned for the safety of his fellow agents.[1] Agent Baudoin lead the defendant back to the apartment building and entered defendant's apartment, no. 307. Agent Baudoin testified that upon entering the apartment, he seated the defendant in a chair and allowed the defendant to read the search warrant. According to the testimony of Agent Baudoin, the defendant was still handcuffed but not yet under arrest. It was only after another agent handed Agent Baudoin an envelope which the agent had discovered in the apartment and which envelope was addressed to Mike Kempton, P. O. Box 3899, Pontiac, Michigan, with the same return address as the envelopes which were the subject of the warrant that Agent Baudoin advised defendant Whitlock of his rights.

The agent read the defendant his Miranda warnings, but at no time during the agent's visit did he, or any of the other five agents who accompanied him, ever advise the defendant that he had a right to refuse the agents access to property or places not described in the warrant.

There is conflicting testimony about what happened next. Special Agent Baudoin testified that after advising Mr. Whitlock of his rights, Agent Baudoin questioned Mr. Whitlock about the whereabouts of the envelopes which had been delivered earlier that day. According to Agent Baudoin, Mr. Whitlock answered that he had placed the envelopes in his briefcase and that his briefcase was in a green Vega which was parked outside. Agent Baudoin further testified that Mr. Whitlock told him that the vehicle was locked and that the keys were on the table. After taking the keys, opening the car, and returning with the briefcase, Agent Baudoin, according to his testimony, opened the briefcase with Mr. Whitlock's assistance. The briefcase was locked, and Mr. Whitlock gave the agent the combination.

On the other hand, both Mr. Whitlock and his wife testified that after Mr. Whitlock said that his briefcase was in his wife's Vega, the agent took the keys to the Vega from the top of the bookcase, because neither the defendant nor his wife was aware that they could object to the agent's actions. In that there were five agents in the defendant's apartment at the time, and considering the abrupt manner in which the "first wave" of agents "secured the premises,"[2] the testimony of the defendant and his wife is extremely credible. Indeed, on

1. Agent Baudoin testified that he did not place the defendant "under arrest" at this time, nor did he advise the defendant of any of his constitutional rights. He also testified, however, that he had parked his vehicle so that it blocked Mr. Whitlock's car and that the defendant was not free to leave. "I would not have allowed him to leave the area."

2. Approximately three or four agents entered the Whitlock's apartment with a pass key. Mrs. Whitlock testified that she heard voices in the hall, and when she went to open the door, thinking it was her husband, the door was

already being opened by the agents. The agents, according to the testimony of Agent James William Hanf, had knocked first, but it is questionable just how hard or how loudly they had knocked, since Mrs. Whitlock heard the key in the door not their knock. Upon entering the apartment, Special Agent William Isenhour testified that anyone inside the premises was "put in a neutral corner." Accordingly, Mrs. Whitlock was "placed on a couch in the front room" and while she was not formally arrested, "she would not have been allowed to leave the apartment."

cross-examination, Agent Baudoin admitted that at the time Mr. Whitlock or his wife identified the location of the keys to the Vega, Agent Baudoin did not inform Mr. Whitlock that he had a right to object to the search of the car. Again, when the agent attempted to open the briefcase which he had seized from the Vega, the agent did not give Mr. Whitlock any indication that the defendant had a right not to have his briefcase opened.

It is the defendant's position that the search of the Vega and seizure of his briefcase violated defendant's rights under the Fourth Amendment to the United States Constitution. It is the government's position that the search and seizure of the evidence in this cause were lawful on the following grounds: (1) The defendant consented to the search, and (2) The seizure was pursuant to 49 U.S.C. §§ 781 and 782.

■ Searches conducted without a warrant are *per se* unreasonable under the Fourth Amendment, except in a "few specifically established and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967). It is the opinion of this Court that the government has failed to establish that the search of the Vega in this case falls within any of the exceptions to the warrant requirement. Specifically, the Court finds that the defendant did not consent to the search nor can the search be justified under 49 U.S.C. §§ 781 or 782.

## I.

■ As its first ground for upholding the search, the government contends that the search of the green Vega was legal since the car was subject to seizure and forfeiture pursuant to 49 U.S.C. § 782 and,

therefore, subject to a lawful search.[3] The forfeiture statute, however, does not dispense with the Fourth Amendment requirements of the United States Constitution. The Act merely authorizes the seizure of a vehicle in the absence of a warrant once a determination of probable cause has been made. *Carroll v. United States*, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925). *United States v. Capra*, 501 F.2d 267 (2nd Cir. 1974). A warrantless search of the vehicle may proceed after a seizure pursuant to 49 U.S.C. § 782, but such seizure must have been based on probable cause. *United States v. White*, 488 F.2d 563 (6th Cir. 1973).

■ The fact that the agents in this case may have been acting pursuant to an Act of Congress, therefore, does not remove the search and subsequent seizure from the purview of the basic constitutional proposition that searches conducted outside the judicial process, without prior approval by a judge or magistrate, are *per se* unreasonable under the Fourth Amendment. *Katz v. United States, supra*. As the Ninth Circuit observed in *United States v. McCormick*, 502 F.2d 281, 285 (1974), unless the statute itself falls within one of the exceptions to the warrant requirement, it must yield to the right to be secure against unreasonable searches and seizures.

Simply stated, Section 782 cannot justify an otherwise unconstitutional search. Accordingly, this Court must inquire into whether the search was reasonable under the Fourth Amendment. In making such an inquiry, the Court is mindful that the relevant test for what constitutes an unreasonable search under the Fourth Amendment is "not the reasonableness of the opportunity to procure a warrant, but the

3. Section 782 reads as follows:
Any vessel, vehicle, or aircraft which has been or is being used in violation of any provision of section 781 of this title, or in, upon, or by means of which any violation of said section has taken or is taking place, shall be seized and forfeited . . .
Section 781, in relevant part, states:
(a) It shall be unlawful (1) to transport, carry, or convey any contraband article in, upon, or

by means of any vessel, vehicle, or aircraft; (2) to conceal or possess any contraband article in or upon any . . . vehicle . . .; or (3) to use any . . . vehicle . . . to facilitate the transportation, carriage, conveyance, concealment, receipt, possession, purchase, sale, barter, exchange, or giving away of any contraband article.

reasonableness of the seizure under all the circumstances. The test of reasonableness cannot be fixed by per se rules; each case must be decided on its own facts." *Coolidge v. New Hampshire*, 403 U.S. 443 (1971) at 509–510, 91 S.Ct. 2022, at 2060, 29 L.Ed.2d 564 (Justice Black concurring and dissenting), cited with approval in *South Dakota v. Opperman*, —— U.S. ——, ——, 96 S.Ct. 3092, 49 L.Ed.2d ——, 19 CrL 3314, 3316 (1976).

■ With this background in mind, the Court has analyzed both Section 782 and the search of the Vega and finds that the search was not reasonable under all the circumstances of this case. Deciding this case on its facts, the Court finds that there was insufficient probable cause to justify the search and seizure. Any claim of probable cause in this case must be based on the statements which the defendant made in response to inquiries about the location of his briefcase containing the "searched for" manilla envelopes. However, the Court has found that these statements were coerced and do not constitute a "free and voluntary" consent to search on the part of the defendant. See discussion of consent, *infra.* Accordingly, the Court also finds that these statements cannot be relied upon for the purposes of establishing probable cause.

■ It is unreasonable for the government to use information obtained as a result of a coerced statement to furnish probable cause. Such a prohibition follows directly from the policy of the exclusionary rule. As Mr. Justice Holmes said in speaking for the Supreme Court in *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920), "The essence of a provision forbidding the acquisition of evidence in a certain way is that not merely evidence so acquired shall not be used before the Court but that it shall not be used at all," at 392, 40 S.Ct. at 183. See also *Wong Sun v. United States*, 371 U.S. 471 (1963), at 485, 83 S.Ct. 407, at 416, 9 L.Ed.2d 441.

In addition, the Court has reached the conclusion that the evidence in this case must be suppressed because the search was conducted as a result of an illegal arrest and was, therefore, tainted as the fruit of the poisonous tree. *Wong Sun v. United States, supra.*

■ Despite the claims of Special Agent Baudoin (see, n.1, *supra* ), the conclusion is inescapable that Mr. Whitlock was arrested as soon as he was accosted by the agents outside his vehicle. Agent Baudoin contends that Mr. Whitlock was not arrested until after a third manilla envelope was discovered in the course of executing the search warrant inside Mr. Whitlock's apartment. This interpretation, as the District Court in *United States v. Gonzalez,* 362 F.Supp. 415 (S.D.N.Y.1973), observed, accords neither with the applicable precedents nor with common sense. As the Court in *Gonzalez* states:

"As soon as the liberty of movement of a suspect is restricted by law enforcement officials (other than what has come to be known as an investigatory 'stop'), an arrest is complete. *Henry v. United States,* 361 U.S. 98, 80 S.Ct. 168, 4 L.Ed.2d 134 (1959); *United States v. Boston,* 330 F.2d 937 (2nd Cir. 1964); *Moran v. United States,* 404 F.2d 663 (10th Cir. 1968). No formula need be uttered nor declaration made to the person arrested; it is sufficient that he be aware that he has been deprived of his full liberty." (citations omitted)

Here, Mr. Whitlock was apprehended at gun point by several federal agents who arrived in a vehicle and parked it so that the vehicle blocked Mr. Whitlock's automobile as Mr. Whitlock was backing out. The defendant was handcuffed and searched, his billfold was confiscated and so were the keys to his car. His car was searched. The detention that was effected by the agents in this case was clearly not limited to an initial stop for the purposes of making an on-the-scene investigation. Such a stop, involving a temporary detention, may be justified on facts that do not constitute probable cause to effect a formal arrest. *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Such official action, however,

must be limited to "the minimal intrusion of a brief stop" for investigation. *United States v. Brignoni-Ponce,* 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975).

In the instant case, the detention that was effected was not a minimal intrusion but a massive assault on the defendant's freedom of movement under the authority of law. The defendant was never told that he was free to leave or that he could refuse to cooperate with the agents. Quite to the contrary, the defendant was physically restrained by the handcuffs, demobilized by the seizure of his car keys, denied his identification by the confiscation of his billfold, and was, even according to the testimony of Agent Baudoin, "not free to leave."

■ From the very outset of his detention, therefore, Mr. Whitlock was under arrest. See *Henry v. United States,* 361 U.S. 98, 80 S.Ct. 168, 4 L.Ed.2d 134 (1959); *Manning v. Jarnigan,* 501 F.2d 408 (6th Cir. 1974). For his arrest to have been lawful, the defendant's arrest must have been based upon probable cause. *Giordenello v. United States,* 357 U.S. 480, 78 S.Ct. 1245, 2 L.Ed.2d 1503 (1958). Probable cause to effectuate a warrantless arrest would exist only if the facts and circumstances known to Agent Baudoin, at the time the arrest was effected, would warrant a prudent person in believing that an offense has been or is being committed and that defendant committed it. *Beck v. Ohio,* 379 U.S. 89, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964). The fact that a subsequent search may disclose evidence that a crime has been committed, in this case that defendant may *knowingly* have possessed or imported a controlled substance, is not enough. "An arrest is not justified by what the subsequent search discloses." *Henry v. United States,* 361 U.S. 98 (1959), at 103, 80 S.Ct. 168, at 171, 4 L.Ed.2d 134.

■ The facts and circumstances within Agent Baudoin's knowledge, at the time the arrest was initiated, do not give rise to reasonable grounds for believing that defendant Whitlock was committing a violation of either 21 U.S.C. Section 841(a)(1) or 21 U.S.C. Section 952(a). At the time of the arrest, Agent Baudoin knew only that two packages containing cocaine had been delivered to the defendant's residence and that the defendant had picked up the packages in the course of picking up his mail, and had placed the envelopes in his briefcase. In other words, at the time of defendant's arrest, Agent Baudoin had no more incriminating information about the defendant's activities than he had had at the time he swore out an affidavit in support of a search warrant to search the defendant's premises.[4] The agent had no information whatsoever that the defendant either knew the addressee or the contents of the envelopes or that defendant was still in actual possession of the envelopes.[5]

In effect, Agent Baudoin further admitted that in his own mind he lacked probable cause to make an arrest by his delay in "formally arresting" the defendant and giving the defendant his Miranda warnings. It was not until the discovery of a third package in defendant's apartment in the course of executing the search warrant that the agent did in fact place defendant formally under arrest. By his awareness of the appropriate procedure to effect an arrest, Agent Baudoin in effect indicated that

---

4. That the agent did not also swear out an arrest warrant at that time further suggests that, in the agent's own mind, there was insufficient information to furnish probable cause for an arrest. As the Supreme Court held in *Wong Sun v. United States, supra,* 371 U.S. at 480, 83 S.Ct. 407, the threshold question in this case is whether the agents could, on the information which impelled them to act, have procured a warrant for the defendant's arrest.

5. Between the time that the defendant picked up his mail and the time that he was approached by Agent Baudoin, the agents had lost track of defendant's activities. The defendant testified that he picked up his mail, exited the building, and placed his briefcase, containing the envelopes, into his wife's Vega which was parked in the rear of the building. He then re-entered the building through the back and went up to his apartment where his wife was waiting for him to run an errand. He was driving his own car and on his way to the store when the agents caught up with him. The agents admitted that he was not under surveillance during this interim period.

**·144**

his prior actions in not arresting the defendant could only be in recognition of the absence of probable cause. It is also telling that the agent, upon seizing Mr. Whitlock and detaining him, took him immediately back to Mr. Whitlock's apartment, as if to corroborate the fact that the agent felt that further evidence of Mr. Whitlock's knowing involvement in the receipt of the two packages was necessary before a lawful arrest could be made.

■ This Court finds that when defendant Whitlock was initially stopped by Agent Baudoin and placed in handcuffs, the defendant's arrest was, at that time, completed. The Court further finds that the arrest was not based upon probable cause and was, therefore, violative of the defendant's rights under the Fourth Amendment. All evidence derived from that illegal arrest must be suppressed. *Harrison v. United States,* 392 U.S. 219, 88 S.Ct. 2008, 20 L.Ed.2d 1047 (1968); *Lawrence v. Henderson,* 344 F.Supp. 1287 (E.D.La.1972). As the Sixth Circuit has stated in *Manning v. Jarnigan, supra,* at 411:

"(I)n view of the deterrent purposes of the exclusionary rule (see *United States v. Calandra,* 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974), any illegal arrest must require suppression of the evidence subsequently seized as a result under the rationale of *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). See also, *Johnson v. United States,* 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436 (1948)."

The exclusionary rule and the rationale of *Wong Sun* were designed to inhibit illicit police practices. The conduct of the agents in the instant case was outrageous and must not be encouraged. However, before suppressing the derivative evidence, the Court will consider whether the taint of defendant's illegal arrest was purged by his alleged consent to the subsequent search of the green Vega.

## II.

■ This Court finds that the search of the Vega and the seizure of defendant's briefcase cannot be justified on the basis of the defendant's alleged consent. Where the consent of the defendant is being used by the government to justify the lawfulness of a warrantless search, the government bears the burden of proving that the consent was, in fact, "freely and voluntarily given." *Bumper v. North Carolina,* 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968). In this case, the government has failed to meet its burden.

■ The Court's conclusion that there was no consent to search is based on the Court's evaluation of the factual circumstances surrounding the search. As the Supreme Court held in *Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973), the question whether a consent to search is in fact "voluntary," is a question of fact to be determined from the totality of all the circumstances. Thus, the presence or absence of a single consensual or coercive factor is not of itself controlling as a matter of law. *United States v. Hearn,* 496 F.2d 236 (6th Cir. 1974). Rather, the Court must carefully sift the unique facts and circumstances of the case before it to determine whether the coercive factors, even those that are subtle and implicit, nevertheless outweigh the non-coercive ones, *United States v. Hearn, supra,* at 243. As stated in the *Schneckloth* case:

"In examining all the surrounding circumstances to determine if in fact the consent to search was coerced, account must be taken of subtly coercive police questions, as well as the possibly vulnerable subjective state of the person who consents." 412 U.S. at 229, 93 S.Ct. at 2049.

In *Schneckloth,* therefore, the Supreme Court recognized that the setting in which the alleged consent is obtained is a critical factor to be considered in determining whether the consent was freely and voluntarily given. The Supreme Court indicated that in making such a determination the courts must be aware of the inherently coercive nature of custodial interrogation. 412 U.S. at 247, 93 S.Ct. 2041. Some recent

cases in the Ninth Circuit suggest even further that the fact that a defendant is under arrest at the time of his alleged consent, while not singularly dispositive, is certainly a factor. *United States v. Heimforth,* 493 F.2d 970 (9th Cir. 1974); *United States v. Rothman,* 492 F.2d 1260 (9th Cir. 1973):

> Where the atmosphere in which defendant's consent is sought is inherently coercive, it "is squarely 'inapposite' to the questioning environment contemplated when consent searches were held permissible. (citation omitted). In a situation such as this, the government's burden to prove voluntary consent is increased. (citations omitted)." at 1264–5.

■ In this case, the defendant was approached at gun point, handcuffed, and escorted back into his apartment where he was surrounded by approximately five DEA agents. He was placed in a chair and not allowed to move about freely although Agent Baudoin claims that he was not yet "under arrest." The manner in which this initial detention was effected is earmarked by surprise, fright, and confusion. Even after he was formally placed under arrest and given his Miranda warnings, the defendant was never advised that he could refuse to cooperate with the agent's request that he locate and open his briefcase containing the manilla envelopes which had been the subject of a controlled delivery earlier in the day.

In viewing all the circumstances surrounding the giving of the alleged consent, this Court finds that the fact that the defendant acquiesced to the agents' demands that led to the taking of his car keys and the seizure of his briefcase was not voluntary consent under the standards set forth in *Schneckloth.* The factors tending to establish an involuntary and coercive acquiescence rather than consent include: (a) The manner in which the defendant was initially approached and detained; (b) The presence of five DEA agents surrounding the defendant and his wife; (c) The fact that the defendant, from the time of his initial encounter with the agents was handcuffed, denied his liberty, and in this Court's opinion, under arrest; (d) The fact that defendant was never advised that he had a right to refuse consent and was not given his Miranda warnings immediately upon his initially being placed in handcuffs and, in this Court's opinion, put under arrest; and (e) The abusive manner in which both the defendant and his wife were treated by the agents.[6] The manner in which the defendant's arrest was effected and the psychologically coercive setting of a custodial interrogation convince the Court that, if there were consent, the consent was not the product of a free and voluntary choice. It is the finding of this Court that the government has failed to show consent that was "unequivocal, specific, and intelligently given, uncontaminated by any duress or coercion." *United States v. Hearn, supra.*

In the absence of uncoerced consent, there is nothing in the record which purges the taint of defendant's illegal arrest. Accordingly, defendant's Motion to Suppress should be, and hereby is granted.

IT IS SO ORDERED.

---

**6.** Mrs. Whitlock testified that the agents were very loud and extremely rough in their handling of her and her husband. According to Mrs. Whitlock's testimony, the agents "acted like it was their place." One of the agents, according to her testimony as well as the defendant's, told them that she and her husband would be arrested and taken downtown and their daughter, who was asleep in the next room, would be taken care of by Juvenile Authorities. In his testimony, Mr. Whitlock also expressed his concern for the welfare of his daughter while the agents were on the premises. At one point during the agents' stay, there was some laughing in the back bedroom where the daughter was sleeping. Mrs. Whitlock stood up instinctively, and Mr. Whitlock leaned forward in his chair to see what was going on, whereupon one of the officers pulled out his gun and, pointing it at Mr. Whitlock, told Mr. Whitlock to sit back in his chair.