767 F.2d 922
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES OF AMERICA, PLAINTIFF-APPELLEE,
v.
FRANK GATES HEMPHILL, DEFENDANT-APPELLANT.
 NO. 84-564
 United States Court of Appeals, Sixth Circuit.
 6/3/85
 
 W.D.Ky.
 AFFIRMED
 On Appeal from the United States District Court for the Western District of Kentucky
 Before: KEITH and JONES, Circuit Judges, and TAYLOR.*
 PER CURIAM.
 
 
 1
 This is an appeal by the defendant, Frank Gates Hemphill, from an order entered by the United States District Court for the Western District of Kentucky upon a jury verdict finding Hemphill guilty of interstate transportation of stolen goods and receiving and concealing stolen goods which have moved in interstate commerce. See 18 U.S.C. Secs. 2314, 2315. For the reasons set forth below, we affirm the order of the district court.
 
 
 2
 On April 20, 1983, codefendants Sam Langford and William Jackson Adair, Jr., were seen at two farm supply stores in Bardwell and Clinton, Kentucky. Both individuals acted suspiciously and did not purchase any items in either establishment. In the Bardwell store, one individual requested something to use with fire ants in a wet area. The store owner became suspicious knowing that fire ants would not be located in a wet area and that he had not heard of any problems with fire ants in Kentucky. When the codefendants left the area, the tag number from their brown van, Mississippi MJ7-481, was recorded. In Clinton, Kentucky, codefendants entered the store through the warehouse area which was unusual since most customers entered through the office area. Codefendants explained being in Clinton, Kentucky, by stating they were looking for someone whose truck they were to repossess. The Hickman County Sheriff was notified of the suspicious activity. The sheriff then contacted authorities in Mississippi regarding the vehicle tag number and was advised that the owner of the vehicle, Langford, and his frequent cohort, Adair, had extensive criminal records, including theft of farm chemicals in 1977. Mississippi authorities additionally informed the sheriff that both men should be considered armed and dangerous, and that one had a prior arrest for killing a police officer in the Chicago area.
 
 
 3
 Based on this information, local law enforcement authorities believed that one of these farm supply stores might be the next target of a herbicide burglary. Law enforcement officers set up a stakeout at each of the farm supply stores and notified nearby Illinois law enforcement authorities to be on the looked for the van and the two men.
 
 
 4
 The stakeout at the farm supply stores in Bardwell and Clinton, Kentucky proved fruitless. However, at approximately 6:30 a.m. on April 21, 1983, a reserve police officer spotted the brown van with Mississippi license tag MJ7-481 driving into a truck stop in Arlington, Kentucky. The van's two occupants remained in the vehicle for a few minutes, when a blue van with Mississippi plates drove in and parked beside the brown van. The occupants of the brown van got out, walked around to the back of the van and checked the back door. The occupant of the blue van, later identified as the appellant, Frank Hemphill, got out of his van, walked to the rear of the vans, then all three walked into the truck stop together. From his vantage, the officer could not see the cargo in the vans, but noted that the vans were heavily loaded. Both vans left the truckstop apparently travelling together. After following the vans for some ten miles, local and state police officers stopped the two vans.
 
 
 5
 In light of the information received from Mississippi authorities stating that codefendant Langford and Adair were to be considered armed and dangerous and that one of the condefendants had been charged with a police killing, the law enforcement officers used extraordinary caution to protect themselves and others. Appellant and codefendants were ordered out of the van, placed face down on the ground so as to inhibit their ability to obtain or use a weapon, and were handcuffed. Once stopped, the officers could see quantities of herbicides in plain view in the rear of both vans.
 
 
 6
 In less than thirty minutes, Illinois police authorities notified Kentucky police authorities of a herbicide theft which had taken place the previous night in Springerton, Illinois. Springerton is located approximately 80 miles away from where the two vans were stopped. Based on this information, a search warrant for appellant's van was obtained and its contents were seized.
 
 
 7
 Subsequently, a two count indictment was returned charging the appellant and codefendants Langford and Adair with the interstate transportation of stolen property and the receipt and concealment of stolen property which had moved in interstate commerce. 18 U.S.C. Secs. 2314, 2315. Codefendants Langford and Adair pleaded guilty to the indictment on January 4, 1984.
 
 
 8
 On May 23, 1984, the district court held an evidentiary hearing on appellant's motion to suppress the evidence found in his van. The court denied appellant's motion and a jury trial was held that same day. The jury returned a verdict finding appellant guilty on both counts of the indictment. On June 22, 1984, the appellant was sentenced to a ten year term of imprisonment for each count. The two sentences were to run concurrently.
 
 
 9
 On appeal, Mr. Hemphill contends, in essence: that notwithstanding their knowledge about the Langford-Adair van, the authorities had no specific and articulable information to justify the stopping of his van; that the unjustified and highly intrusive manner in which his van was stopped, in effect, constituted an arrest; that this arrest was not supported by probable cause; and therefore, the evidence seized from the subsequent search of his van should have been suppressed. While we recognize this to be a somewhat close question, on the specific facts presented by this case, we are not persuaded by the appellant's argument.
 
 
 10
 This Court has noted on numerous occasions that in Terry v. Ohio, 392 U.S. 1 (1968), the Supreme Court authorized a limited exception to the fourth amendment requirement of the presence of probable cause in order to justify the seizure of a person. This Terry exception allowed law enforcement officials to undertake 'investigative steps on something less than probable cause where the governmental interest is important and the law enforcement officer is 'able to point to specific and articulable facts, which taken together with rational inferences from those facts, reasonably warrant that intrusion." United States v. Saperstein, 723 F.2d 1221, 1229 (6th Cir. 1983) (quoting Terry v. Ohio, 392 U.S. at 21).
 
 
 11
 The Supreme Court noted in Terry that the test of constitutional validity for a particular intrusion into one's personal security is a question of reasonableness under the circumstances. Specifically, the Court stated: 'our inquiry is a dual one- whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place.' 392 U.S. at 19-20. We believe that an analysis of the particular facts at bar demonstrate that the investigative stop of Mr. Hemphill passes constitutional muster.
 
 
 12
 We address first the question of whether the officers' actions were justified at their inception. As a preliminary matter, this Court notes that there is no serious dispute as to whether or not the police officers had specific and articulable facts concerning the Langford-Adair van. See Appellant's Reply Brief at 2-3. Given the facts that Langford and Adair were observed acting suspiciously at two local farm supply stores; that the description and license number of their van was reported to Kentucky authorities; that Kentucky authorities were apprised of Langford and Adair's history of pesticide theft, propensity for carrying weapons and commission of a fatal assault on a police officer; and that when observed on the morning of April 21, 1983, their van appeared to be heavily loaded- clearly, the police officers' action in stopping Langsford and Adair was based upon specific and articulable facts.
 
 
 13
 Notwithstanding these facts concerning Langford and Adair, Mr. Hemphill argues, with some force, that Kentucky authorities had no such facts concerning him. Thus, Mr. Hemphill contends, the stopping of his van could not be justified by specific and articulable facts. While we recognize this to be a close question, we do not ultimately agree with Mr. Hemphill's contention. Admittedly, prior to the morning of April 21, 1983, Kentucky authorities had no information about Mr. Hemphill or his van. However, on that morning at the truck stop in Arlington, Kentucky, the police observed several facts sufficient to reasonably arose suspicion about Mr. Hemphill. It will be recalled that after parking in the truck stop, Langford and Adair were perceived to remain in their van until Hemphill pulled in and parked next to them, Joint Appendix at 5; Langford and Adair checked the back door of their van and were joined at the rear of the vans by Hemphill, Id.; the three men were observed to walk into the truck stop together and later to exit close to the same time, id. at 53-54; and the two vans were observed to leave the truck stop and to travel together heading south until stopped. Id. at 47, 53.
 
 
 14
 While in and of themselves these facts may all be innocent enough, we find that the information known about Hemphill provided a reasonable nexus between the appellant and Langford and Adair so as to provide the police with specific and articulable facts to warrant an investigative stop of Hemphill's van. Cf. United States v. Sharpe, 105 S.Ct. 1568, 1573 & n.3 (fact that two vehicles travelled in tandem for 20 miles in an area known for drug trafficking, one of the vehicles of the type often used to transport large quantities of drugs, one of the vehicles heavily loaded and had the rear windows covered and vehicles took evasive action when followed by state trooper held to provide clear justification to stop both vehicles and investigate). Even though the facts known about Hemphill did not amount to probable cause to arrest, '[t]he Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape.' Adams v. Williams, 407 U.S. 143, 145 (1972). Thus, we hold that the first prong of the Terry analysis was met- the Kentucky authorities had specific and articulable facts, which taken together with the rational inferences drawn from those facts, reasonably warranted the intrusion.
 
 
 15
 Next, we addres the question of whether the officers' actions were reasonably related in scope to the circumstances which initially justified the interference. Again, Mr. Hemphill argues, with some force, that the manner in which the investigatory stop was conducted was so extremely intrusive as to constitute an arrest. While this Court in no way wants to suggest to law enforcement officials that the highly intrusive gundrawn approach is the proper manner in which to conduct a routine investigatory stop, on the specific facts of this case we are ultimately not persuaded that the stopping of Hemphill's van constituted a de facto arrest.
 
 
 16
 Admittedly, there is authority which suggests that the blocking of a defendant's automobile and the approach of police officers with guns drawn does not fit within the narrow exception established by Terry. See, e.g., United States v. Ceballos, 654 F.2d 177, 184 (2d Cir. 1981); United States v. Whitlock, 418 F.Supp. 138, 142-43 (E.D. Mich. 1976); aff'd without published opin., 556 F.2d 583 (6th Cir. 1977). We believe, however, that upon close analysis these authorities are sufficiently distinguishable so as to demonstrate that the degree of force used in the matter at bar was not per se unreasonable.
 
 
 17
 For example, in United States v. Ceballos, the Second Circuit found that the blocking of the defendant's car, the approach of officers with guns drawn, and the ordering of the defendant from his car, was not an investigatory stop, but rather an arrest. However, in Ceballos, the Second Circuit expressly noted that in approaching this suspected narcotics purchaser 'the officers articulated no facts which they [the officers] viewed as creating a need for the use of force and a degree of intrusion beyond that generally employed in Terry stops.' 654 F.2d at 183-84; cf. United States v. Whitlock, 418 F.Supp. at 144, 142-43 (federal agents behavior held 'outrageous' where in executing a search warrant at a family home a defendant not known to be violent was accosted at gunpoint, his vehicle blocked from moving, defendant handcuffed and searched, his billfold and car keys confiscated, his car searched, and defendant led back to apartment and, with wife, demobilized during search). By contrast, in the instant case the appellant was travelling in convoy with the codefendants, Langford and Adair, who were known to be armed and dangerous, and were reported to have committed a fatal assault upon a police officer.
 
 
 18
 We candidly acknowledge that the connection between the appellant and the reported armed combative behavior of the codefendants is not as strong as some cases this Court has seen. However, given the specific situation the police confronted when they determined to stop the two vans, we cannot say they acted unreasonably. In Terry, the Supreme Court stated:
 
 
 19
 [W]e cannot blind ourselves to the need for law enforcement officers to protect themselves and other prospective victims of violence in situations where they may lack probable cause for an arrest. When an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others, it would appear to be clearly unreasonable to deny the officer the power to take necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm.
 
 
 20
 392 U.S. at 24. Accordingly, in balancing the need for the manner in which the stop was effected against the degree of intrusion upon the appellant's personal security, we hold that under the circumstances the police officers' conduct was not unreasonable and the investigative stop was not tantamount to an arrest. We stress, however, that this holding is expressly based upon the fact that there was a rational and articulable nexus between the occupants of the two vans and that the occupants of one of the vans were known to be armed, dangerous, and to have committed a fatal assault upon a police officer.
 
 
 21
 Having determined that the Kentucky police did have specific and articulable information to justify stopping Mr. Hemphill's van, and having determined that the manner in which the investigatory stop was conducted did not constitute an arrest, we find the appellant's argument for suppression to collapse. To recount the facts briefly, once the vans were stopped the police could see a quantity of herbicides in plain view in the rear of both vans. Less than thirty minutes after the stop, Illinois authorities notified the Kentucky police of a large scale theft of herbicides which occurred the previous night in a nearby Illinois community. Based upon this information, a search warrant for the appellant's van was obtained and the incriminating stolen herbicides seized.
 
 
 22
 Since we believe this case approaches the constitutional outer limit of an investigatory stop, we feel it important to emphasize what this case does not decide. This case does not decide that merely seeing people together or seeing two vehicles with out-of-state tags travelling on the road at the same time enables law enforcement officials to transfer their legitimate suspicion about one person or vehicle to a second person or vehicle. This case does not decide that law enforcement officials can seek to justify an arrest on mere articulable suspicion which they hope to boot-strap into probable cause by conducting a post-arrest search. And most assuredly, this case does not decide that law enforcement officials are justified in effecting a highly intrusive gun-drawn stop as the routine manner of conducting an investigatory stop.
 
 
 23
 Having thus noted the concerns of this Court, the judgment of the Honorable Edward H. Johnstone is hereby affirmed.
 
 
 24
 JONES, Circuit Judge, concurring, in part and dissenting, in part.
 
 
 25
 I agree with the majority that the officers had a particularized and justified basis for suspecting Hemphill of criminal activity. Consequently, under Terry v. Ohio, 392 U.S. 1 (1968), and its progeny the police officers could have legitimately stopped Hemphill for investigative purposes. The police officers, however, converted what could have been a legitimate stop into an illegal arrest. As a result, I disagree with the majority that the officers' actions were reasonably related in scope to the circumstances that initially justified their interference.
 
 
 26
 When executing an investigative stop, the police should use 'the least intrusive means reasonably available to verify or dispel [their] suspicion in a short period of time.' Florida v. Royer, 460 U.S. 491, 500 (1983). Consequently, '[a]n action tantamount to an arrest has taken place if the officers' conduct is more intrusive than necessary for an investigative stop. United States v. Rose, 731 F.2d 1337, 1342 (8th Cir.), cert. denied, ---- U.S. ----, 105 S. Ct. 326 (1984). The State bears the burden of demonstrating that the officers' conduct was not unreasonably intrusive. Royer, 460 U.S. at 500.
 
 
 27
 The majority fails to analyze the facts of this case to determine whether the officers employed the least intrusive method of investigation reasonably available to verify or dispel their suspicions that Hemphill had participated in a herbicide theft. To engage in that analysis, I note that the officers blocked both Hemphill's and Langford's vans, used a 'gun-drawn' approach, ordered Hemphill, Langford, and Adair to exit their vehicles and to lie prone on the ground, and then handcuffed them. That highly intrusive conduct was directed towards Hemphill, Langford, and Adair equally, although the amount and quality of the information gathered about Hemphill differed substantially from that which was gathered about Langford and Adair. The only information that the officers had gathered about Hemphill concerned a physical description of his van and his apparent in tandem travel with Adair and Langford. The officers had not run a license plate check on Hemphill's van, the license plate check on Langford's van had not returned any information regarding Hemphill, and no police officer had been notified that Hemphill had acted suspiciously prior to his appearance at the truck stop. Nevertheless, as their conduct demonstrated, the officers did not consider the differential in information and the effect of that differential upon their investigative method. Instead, they cavalierly employed one method to investigate Hemphill, Langford, and Adair.
 
 
 28
 I, however, firmly believe that the police officers could have employed a method of investigating Hemphill that was less intrusive. For example, they could have separated Hemphill's van from Langford's van so that each van was stopped miles apart from each other. Then, the officers could have investigated Hemphill differently from Langford and Adair. That investigative method was feasible because several police cars followed both vans and because the vans traveled almost ten miles from Fulton to Arlington, where, respectively, they were sighted and stopped. That investigative method was reasonable because although there was a 'nexus' between Adair, Langford, and Hemphill, there was also a disparity in the information gathered about the co-defendants.
 
 
 29
 Thus, the officers' actions in stopping Hemphill were tantamount to a warrantless arrest. For such an arrest to be legal 'both probable cause to arrest and exigent circumstances to excuse the necessity for obtaining an arrest warrant' are necessary.' United States v. People, 707 F.2d 261, 263 (6th Cir. 1983). Probable cause is reasonably trustworthy information from which a person of reasonable caution would believe that an offense has been or is being committed. Brinegar v. United States, 338 U.S. 160, 175-76 (1949). Reasonable suspicion can be elevated into probable cause. Here, however, the officers' reasonable suspicions of Hemphill were not elevated to probable cause before they stopped him and before they converted the stop into a warrantless arrest. The subsequent discovery of the herbicide in Hemphill's van elevates the officer's reasonable suspicions to probable cause only after the officers' unnecessarily intrusive conduct converted the legitimate investigative stop into an arrest. Therefore, I dissent.
 
 
 
 *
 Honorable Anna Diggs Taylor, United States District Court, Eastern District of Michigan, sitting by designation