UNITED STATES of America

v.

Jose PATINO–ZAMBRANO, Defendant.

No. 79 CR 465.

United States District Court, E. D. New York.

Dec. 28, 1979.

Edward R. Korman, U. S. Atty., Eastern District of New York, Brooklyn, N.Y. by Rhonda C. Fields, Vivian Shevitz, Asst. U. S. Attys., Brooklyn, N.Y., for plaintiff.

Axelrod & Warburgh, New York City by Paul E. Warburgh, Jr., New York City, for defendant.

## MEMORANDUM AND ORDER

NEAHER, District Judge.

Following a three-day evidentiary hearing and denial of his motion to suppress

various items of evidence, defendant pleaded guilty to a one count indictment charging him with conspiracy to distribute and possess with intent to distribute quantities of cocaine in violation of 21 U.S.C. §§ 841(a)(1), 846. He reserved his right to challenge the court's denial of his motion pursuant to procedure approved in cases such as *United States v. Vasquez*, 612 F.2d 1338, 1339, n. 2 (2 Cir., November 30, 1979); *United States v. Vasquez-Santiago*, 602 F.2d 1069, 1070 n. 2 (2 Cir. 1979); *United States v. Price*, 599 F.2d 494, 496 n. 1 (2 Cir. 1979). The following constitutes the court's findings of fact and conclusions of law on the motion to suppress.

Acting on information provided by a confidential informant whose reliability had been tested, DEA agents in a joint effort with State authorities began investigation of an allegedly large scale cocaine ring operating in the Queens area. The organization was reported to be highly sophisticated in its use of "stash locations" for money and cocaine, electronic beeper systems and new cars with switched license plates. One such vehicle was specifically identified by the informant as a red Chevrolet bearing a license number 757–JKB.

On September 25, 1978, the agents received information from their informant (allegedly employed by the drug ring itself) that a cocaine transaction would occur later in the day at a location in the vicinity of 67th Avenue and Queens Boulevard. Nelson Gomez was arrested that day in possession of a brown paper bag containing approximately one kilogram of cocaine, after meeting with a man who met him in a new red Chevrolet bearing license number 916–IAX. The agents attempted but were unable to keep the vehicle under surveillance.

Further investigation revealed that a red Chevrolet bearing license number 573–FEJ and apparently belonging to an "Antonio Villa" was the car whose vehicle identification number matched that of the Chevrolet previously bearing license 916–IAX, which was involved in the foregoing narcotics transaction. Agents observed the car parked at 108–50 62nd Drive, Queens, in an underground parking space, which belonged to the occupant of apartment 5E, "Antonio Villa." The superintendent of the building later identified "Villa" from a photograph the agents knew to be that of Victor Crespo, a reputed "kingpin" of the Queens cocaine traffic.

On October 6, 1978, the agents observed a blue Buick with license plate number 609–HZC in front of 108–50 62nd Drive. Investigation disclosed that license number 573–FEJ was issued to the blue Buick although it was then on the red Chevrolet parked in the garage at 108–50 62nd Drive. Surveillance of the blue Buick between October 4 and 12, 1978, led the agents to believe that it was being used in a series of narcotics transactions and, on the 12th of October, two individuals, Edgar Lopez Cardona and Gustavo Ceballos, were arrested at 85–25 68th Road in Queens. The agents discovered in apartment 4–G at that address over $127,000 in currency, an arsenal of weapons, five pounds of cocaine and various records. The superintendent of that building identified a picture of Victor Crespo as looking like the man who rented the apartment.

At approximately the same time, Theodoro Hernandez was arrested. He had been one of the men identified as participating in the transactions that occurred during surveillance of the blue Buick. Agents seized a small red book with notations, among them a number, "VIPER 556–9612," which recorded voice-activated beeper messages.

The following day, October 13, 1978, the agents attempted to locate the last man identified as a result of surveillance of the Buick. At apartment 2G of 99–44 62nd Avenue, Queens, thought to be occupied by a male identified as "Shorty," the agents discovered a small quantity of cocaine and two kilograms of cutting materials. The management of the building identified a picture of Victor Crespo as the man who rented the apartment.

Defendant first entered the scene a few days earlier, although Detective Robert Johnson testified that Patino's name first turned up in the investigation after the arrest of Gomez on September 25, 1978. On

October 10, 1978, the agents observed defendant driving a red Chevrolet bearing license number 757–JKB in the vicinity of 108–50 62nd Drive in Rego Park, Queens, both the car and the address being already associated with the investigation through information provided by the confidential informant. Defendant drove in an evasive manner to La Guardia Airport, went to the Sheraton Hotel, wore a voice-activated beeper in his belt and finally proceeded to Corona where he entered an automobile repair shop called Enfa Auto Repairs.

At the garage defendant was observed opening the trunk of another red Chevrolet bearing license number 916–IAX, identified as being used during a narcotics transaction on September 25, 1978. He returned to his own vehicle and drove to a travel agency in Queens, Cupido Travel, later asserted to be his place of employment. While defendant remained inside the agency, another male drove his vehicle, license 757–JKB, away and returned 30 minutes later. Patino promptly walked out of the agency and proceeded to 85th Street where he met Alonzo Isaza-Zapata. They next met another man, Helder Victoria Pulgarin, who removed a brown manila envelope from the trunk of a Volkswagon and handed the envelope to defendant. All three men drove back to the vicinity of Cupido Travel. Patino went to the trunk of his car, 757–JKB, removed a brown bag, handed it to Isaza, who then drove away with Victoria. The agents followed Isaza and Victoria and arrested them shortly thereafter in possession of a number of weapons subsequently found to have been stolen from an interstate shipment. Also found were various documents in Victoria's possession, which included a list of numbers, among them "VIPER 556–9612," the same number found upon the earlier arrest of Hernandez, and the number "FER 441–0959," listed to Fernando Carmona at 85–31 120th Street, Queens, apartment 4F.

On January 15, 1979, agents of the DEA observed defendant at the International Arrivals Building at JFK Airport. There he met a man and a woman arriving on a flight from Colombia. The agents recognized the male as Victor Crespo, although this was not the name he gave the agents upon questioning.

On February 1, 1979, agents again observed Patino and Crespo, this time at 175–20 Wexford Terrace. Patino and Crespo entered a car and Patino drove to Farmingdale Airport, from which they departed on a charter aircraft. On their return, Patino drove Crespo back to Wexford Terrace.

Patino was next observed on February 2, 1979, when he delivered dry cleaned clothes to apartment 15X, 175–20 Wexford Terrace, which had been rented to Crespo and his wife in September 1978. Patino then drove his vehicle in front of the building and picked up Victor Crespo. They proceeded to an address on 120th Street and picked up a third male, identified as Fernando Carmona, who had been previously linked to the cocaine organization (Carmona's telephone number was found upon the arrest of Victoria on October 10, 1978). Carmona and Crespo then purchased tickets for a Delta Airlines flight.

Investigation beginning in April 1979 led the agents to interview the management of an apartment building at 41–40 Union Street. Apartment 11F was leased to a Yolima and Gaston Charles, whose lease application disclosed an association with a jewelry shop linked to a woman suspected of being a major cocaine trafficker, Irma Mejia. Analysis of telephone records at the number listed at 41–40 Union Street reflected numbers also called by the occupants of apartment 15X, 175–20 Wexford Terrace.

On July 10, 1979, Detective Robinson of the New York City police interviewed the superintendent at 41–40 Union Street. He was advised that the superintendent had not seen anyone in or about apartment 11F for some time. According to Detective Robinson, the superintendent offered to knock to see if anyone was occupying the apartment. After the superintendent opened the door, Robinson looked inside and observed on the dining room table a machine, which he recognized as one for de-

tecting counterfeit money, an adding machine and various other items consistent with illegal activity. He then entered the living room, examined some of the items and saw an entry of $100,000 on the adding machine tape. The following day agents placed a pen register on the telephone at 41–40 Union Street.

In the subsequent days, information provided by the superintendent and handy man at 41–40 Union Street revealed activity at the apartment, which strengthened the agents' belief that certain individuals were using the apartment to conduct an illegal enterprise.

Finally, on July 26, 1979, the events leading to defendant's arrest occurred. At approximately 3:30 p. m., information was provided to the agents that a male hispanic had arrived at 41–40 Union Street and had entered apartment 11F. Contemporaneous examination of the pen register tape revealed an outgoing call to a number Special Agent William Mochler, the agent in charge of the investigation, recognized as one for the voice-activated electronic beeper associated with the organization. The agents maintained surveillance outside apartment 11F throughout the afternoon.

At approximately 6:15 p. m., a male hispanic left apartment 11F and locked the door with a key. Upon seeing the agents in the hallway, the man hesitated but then walked to the elevator. Although the facts are disputed from this point, the court credits the testimony of the agents and finds that subsequent events unfolded in substantially the following manner.

Agent Mochler identified himself as a federal agent and asked to speak with the man. Although defendant testified that he was subjected to a frisk, it is undisputed that he did identify himself as Jose Patino. He then agreed to answer the agents' questions. He responded that he had gone to the apartment to pick up the two bags he was carrying for a friend and had taken a nap while at the apartment. He also responded that a black bag in his possession contained a money counting machine, which at Mochler's request defendant permitted

him to inspect; he stated he had picked the machine up for some friends and that the apartment belonged to Yolima Charles. Defendant thereafter gave the agents permission to inspect a maroon bag he was also carrying and, after denying that the apartment contained anything illegal, opened the door of the apartment with his set of keys and permitted the agents to enter to see for themselves. A search of the apartment was conducted after defendant told the agents he had no objection to such a search.

While the search was being conducted, the agents asked Patino if they could search through the maroon leather bag, which he claimed belonged to his friend. He responded that he had no objection since the bag was not his. Search of this bag disclosed certain money order receipts for apartment rentals, a voice-activated beeper and an airline ticket for a flight to Baltimore the following morning. According to the agents' testimony, the beeper was activated during their examination of the contents of the bag and a male hispanic voice stated in an excited tone, "Pepe, que pasa, que pasa, Pepe?" Agent Mochler thereupon directed other agents to go to apartment 1CC at 61–01 Burns Court, Forest Hills, Queens, an address appearing on one of the receipts found in the maroon handbag, as well as to other locations revealed by the contents of the bag.

After leaving 41–40 Union Street, Patino agreed to accompany the agents to an address on 88th Street in Jackson Heights, Queens, which Patino claimed was his own apartment. Unable to enter that apartment because one of Patino's friends allegedly possessed the key while he was painting the apartment, Patino agreed to go with the agents to the Burns Court address to meet the other agents.

Arriving at the building at 66–01 Burns Court, Agent Mochler asked Patino if he had ever visited the address before. He admitted that he had been there before to visit friends. He permitted the agents to use a set of keys found in the maroon bag to attempt to see if any of them fit locks to apartments in the building, stating that he

had no objection to use of the keys since he claimed they were not his. At the same time, other agents had determined that it was not possible to ascertain whether or not apartment 1CC was currently occupied since there were heavy draperies over the windows. Agent Mochler did see a light in the apartment by looking under the door. Accordingly, the agents entered the apartment with guns drawn using one of the keys found in the maroon bag.

They immediately smelled cocaine and, while checking to see if anyone was in the apartment, observed in an open closet large clear plastic bags of white powder later found to contain approximately 40 pounds of cocaine. They also observed an arsenal of weapons and other miscellaneous items. The apartment was thereafter searched pursuant to warrant.

After the agents returned from their investigation of apartment 1CC, Patino declined to answer any further questions without the assistance of a lawyer. He was then placed under arrest and read his *Miranda* rights. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

### Discussion

Defendant contends that all the items seized from the apartments and statements taken during the course of the extended investigation should be suppressed because obtained in violation of his Fourth and Fifth Amendment rights. In analyzing these claims, we must begin with a determination of the propriety of the agents' actions when they first stopped Patino outside apartment 11F at 41–40 Union Street. Although the government urges that the court find no Fourth Amendment "seizure" since it claims Patino was restrained by neither physical force nor show of authority, see *United States v. Price,* 599 F.2d 494, 498–99 (2 Cir. 1979); *United States v. Wylie,* 186 U.S.App.D.C. 231, 236–237, 569 F.2d 62, 67–68 (D.C.Cir.1977), *cert. denied,* 435 U.S. 944, 98 S.Ct. 1527, 55 L.Ed.2d 542 (1978), it is apparent that the initial encounter most certainly fell within limits of the investigatory stop doctrine of *Terry v. Ohio,*

392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1967).

As Judge Kaufman noted in his concurring opinion in *United States v. Vasquez, supra,* this conclusion would have given the court little reason to pause were it not for "contrary dicta" of *Dunaway v. New York,* 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979). There the Court intimated that the *Terry* doctrine may be confined to protective searches for weapons and may not be used to justify the investigative stops on reasonable suspicion with which we have become familiar. See also *Ybarra v. Illinois,* —— U.S. ——, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979). Holding to the view that *Terry* is not so limited until instructed otherwise by a higher court, the panel in *Vasquez* determined over Judge Oakes' dissent that the officers' right to make the initial stop depends on a reasonable belief that the suspect is engaging in criminal activity, regardless of whether he is also armed and dangerous. *United States v. Vasquez, supra,* at 1348. As the Court stated in *Adams v. Williams,* 407 U.S. 143, 145, 92 S.Ct. 1921, 1923, 32 L.Ed.2d 612 (1972),

> "The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape. On the contrary, *Terry* recognizes that it may be the essence of good police work to adopt an intermediate response."

Thus, investigation of possible criminal behavior, including brief detention for questioning, is permissible even though there is no probable cause to make an arrest as long as the agents are able to point to specific and articulable facts, which, taken together with rational inferences from those facts, reasonably warrant that intrusion. *See Brown v. Texas,* 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979); *United States v. Brignoni-Ponce,* 422 U.S. 873, 880–81, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975); *Terry v. Ohio, supra,* 392 U.S. at 21–22, 88 S.Ct. 1868. *See also United States v. Vasquez,*

*supra; United States v. Nieves,* 609 F.2d 642, 647–648 (2 Cir. 1979); *United States v. Price, supra,* 599 F.2d at 500.

Upon such facts, "[a] brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information may be most reasonable . . ." *Adams v. Williams, supra,* 407 U.S. at 146, 92 S.Ct. at 1923. *See United States v. Brignoni-Ponce, supra,* 422 U.S. at 882–83, 95 S.Ct. 2574. Moreover, the Court of Appeals for this circuit recently recognized that in appropriate circumstances the *Terry* doctrine authorizes not only investigative stops but also temporary detention of suspects and removal to a location more conducive to effective interrogation. *United States v. Nieves, supra,* at 648, *citing United States v. Oates,* 560 F.2d 45, 56–61 (2 Cir. 1977).

Applying these principles, the court finds that the initial encounter in the hallway of 41–40 Union Street justified as based on reasonable suspicion. It is settled that the common areas of an apartment building are public places in which individuals do not have a reasonable expectation of privacy. *See, e. g., Sibron v. New York,* 392 U.S. 40, 50, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968); *United States v. Reed,* 572 F.2d 412, 423 (2 Cir.), *cert. denied,* 439 U.S. 912, 99 S.Ct. 283, 58 L.Ed.2d 259 (1978). Thus, the agents were justified in seeking to maintain the status quo by attempting to question Patino briefly in the hallway. The information known to the agents, moreover, when they first observed Patino leave the apartment amply satisfied the requirement of articulable facts sufficient to warrant under the *Terry* doctrine the limited intrusion that occurred. Investigation of the Union Street apartment revealed an association with a woman suspected of being a major cocaine trafficker through information supplied by a reliable confidential source. Analysis of telephone records at the Union Street apartment reflected numbers also called by the occupants of apartment 15X of 175–20 Wexford Terrace, an apartment associated with Victor Crespo,

under investigation as a major narcotics trafficker. Information provided by the superintendent and handy man at the Union Street address revealed behavior consistent with the agents' experience with other apartments employed by the particular drug operation under investigation. Finally, examination of the pen register on the telephone at Union Street after the male hispanic arrived there on July 26, 1979, indicated that calls identified with the beeper system known by that time to be part of the organization's mode of operation had been made. Thus, as the agents waited outside the apartment, their belief that the apartment was being used by a drug organization and that the occupant was associated with it went far beyond mere suspicion or intuition.

When Patino left the apartment, moreover, the agents' reasonable suspicion that he was connected in some manner with those under investigation was confirmed. Agent Mochler testified that he recognized Patino as the male seen driving a red Chevrolet 757–JKB on October 10, 1978, specifically identified by a reliable confidential informant as being used by members of the drug organization. This was the same day upon which Patino was observed with Isaza and Victoria shortly before their arrest for possession of weapons found to have been stolen from an interstate shipment. The agents also recognized Patino as the man observed opening the trunk of a vehicle that had delivered cocaine to Nelson Gomez on September 25, 1978, shortly before his arrest. Finally, the agents identified him as the man who had chauffeured Victor Crespo, identified by reliable confidential sources as a "kingpin," at various times in January and February 1979. Thus, there was more than ample cause to stop Patino as part of the agents' continuing investigation when he left the Union Street apartment. The fact that the agents did not know the true identity of the individual they were about to stop until immediately before they had actually made the initial encounter is completely irrelevant in these circumstances.

■ Here, the agents maintaining surveillance on the Union Street apartment suspected of having a connection with the drug organization under investigation immediately approached and stopped Patino when he left the apartment. They thereupon identified themselves and asked Patino for his identification. In view of the agents' knowledge of the operation of the drug organization and their reasonable suspicion of the Union Street apartment and Patino as a part of it, this initial stop falls within the category of less intrusive seizures that satisfy the Fourth Amendment on grounds less rigorous than probable cause. *See United States v. Vasquez, supra,* at 1350, *citing Dunaway v. New York, supra,* 99 S.Ct. at 2255; *United States v. Brignoni-Ponce, supra,* 422 U.S. at 880, 95 S.Ct. 2574.

■ The Supreme Court's recent decision in *Ybarra v. Illinois, supra,* —— U.S. ——, 100 S.Ct. 338, 62 L.Ed.2d 238, does not require a different result. There the Court determined that a warrant based on probable cause to search a tavern and its bartender could not be read to authorize a search of each patron of the bar who happened to be there. It rejected the State's argument that a *Terry* pat-down search was justified in the circumstances, which it claimed yielded the probable cause to support a subsequent warrantless search based on the exigencies of the situation. While the Court did note in *Ybarra* that the Fourth and Fourteenth Amendments provide individualized protection against unreasonable searches and unreasonable seizures, —— U.S. at ——, 100 S.Ct. 338, we are not confronted here with a "generalized" cursory search for weapons found repugnant by the Court in *Ybarra.* On the contrary, the agents here had every reason to suspect that the individual who had access to the apartment at Union Street, who upon entry used the telephone to dial numbers associated with the beeper system employed by the drug organization under investigation, and who was identified upon leaving the apartment as an individual observed on a number of occasions in circumstances strongly suggesting his relationship to participants in the operation, was no mere bystander or innocent occupant of the premises. The agents clearly had reasonable suspicion to stop Patino and detain him briefly for the purpose of identifying himself and explaining the circumstances of his presence at the Union Street location. The facts suggest no generalized seizure but the essence of good police work.

■ While defendant's principal argument is premised on his claim that there was no basis whatever for a *Terry* stop, implicit in his further argument that statements were taken in violation of his Fifth Amendment rights is a contention that the agents exceeded the limited intrusion permitted by the *Terry* case; he appears to contend that the encounter proceeded beyond a mere investigatory stop at the moment the agents recognized Patino and developed into an actual arrest or "investigatory seizure" prohibited by the decision in *Dunaway v. New York, supra. See United States v. Nieves, supra,* 609 F.2d at 648 n.10. *See also United States v. Vasquez-Santiago, supra,* 602 F.2d 1069. As the court noted in *United States v. Oates, supra,* 560 F.2d at 58, however, "the issues involved in determining the propriety of stops, arrests and searches must be resolved by an objective rather than a subjective standard" (footnote and citations omitted). Viewed in this manner, Patino's detention in the hallway for the purpose of determining his association with the apartment under surveillance and his presence at a location under suspicion of being used in narcotics trafficking was clearly a permissible stop under the *Terry* rationale and not an arrest. *Cf. Ybarra v. Illinois, supra; Dunaway v. New York, supra.*

■ Assuming, moreover, that the scope of the initial stop encompassed Patino's re-entry into the apartment with the agents, the credible evidence supports a finding that Patino voluntarily acquiesced in the agents' request that they return to the apartment, which is clearly consistent with the conclusion that Patino was not under arrest at that time. *See United*

**254**

*States v. Nieves, supra,* 609 F.2d at 648 n.10. As in *United States v. Magda,* 547 F.2d 756 (2 Cir. 1976), *cert. denied,* 434 U.S. 878, 98 S.Ct. 230, 54 L.Ed.2d 157 (1978), the scope of the particular intrusion was not unreasonably related to the purpose for the initial stop: the agents entered the apartment with Patino's agreement to confirm information he provided. The agents had not drawn their guns. Patino was not placed in handcuffs. The agents did not harass or intimidate him; the credible evidence revealed that he was not physically restrained or humiliated in any manner. Patino was simply asked certain questions designed to ascertain his identity and association with the apartment, and later asked if he would have any objection to the agents accompanying him into the apartment from which he had just exited. While this request could perhaps be justified by a legitimate desire to remove Patino to a location more conducive to effective interrogation (although not as a pretext to gain entry to the apartment to conduct an otherwise unlawful search), see *United States v. Nieves, supra; United States v. Oates, supra,* or to investigate further the circumstances under which the agents confronted Patino, it most certainly did not transform the initial stop into an arrest, *see United States v. Thevis,* 469 F.Supp. 490, 501 (D.Conn.), *aff'd,* (2 Cir. 1979); *United States v. Wylie, supra,* 569 F.2d at 77. *See also United States v. Thompson,* 558 F.2d 522, 524 (9 Cir. 1977), *cert. denied,* 435 U.S. 914, 98 S.Ct. 1466, 55 L.Ed.2d 504 (1978) (use of force to compel investigatory detention after all-night surveillance does not transform a proper stop into an arrest). The situation is simply unlike that presented in *Dunaway v. New York, supra,* where the police seized petitioner from his home and transported him to the police station for custodial interrogation without probable cause to do so. *See United States v. Nieves, supra,* at 648 n.10.

The scope of the *Terry* stop was not impermissibly broadened by the agents' request that Patino accompany them into the apartment, moreover, since the court finds that any further detention and the searches of the bags and the Union Street apartment were valid as based on Patino's consent. See *United States v. Brignoni-Ponce, supra,* 422 U.S. at 881–82, 95 S.Ct. 2574; *United States v. Martinez-Fuerte,* 428 U.S. 543, 567, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976). See also *Dunaway v. New York, supra,* 99 S.Ct. at 2256. Although mere acquiescence to lawful authority or submission to express or implied coercion cannot validate a search, *Schneckloth v. Bustamonte,* 412 U.S. 218, 222, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *Bumper v. North Carolina,* 391 U.S. 543, 548–49, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968); *United States v. Price, supra,* 599 F.2d at 503, the government can show that the consent was freely and voluntarily given from the totality of all the circumstances, *Schneckloth v. Bustamonte, supra,* 412 U.S. at 227, 93 S.Ct. 2041; *United States v. Price, supra,* 599 F.2d at 503. Here, the government has made such a showing.

The credible evidence revealed that the agents confronted Patino in the public hallway outside the apartment. The agents were not uniformed officers and did not have their guns drawn when they made their initial contact. After identifying themselves, they proceeded to inquire into Patino's identity and association with the apartment under surveillance. They further inquired into the contents of the two bags Patino was carrying out of the apartment. To these questions, Patino replied that he had no objection to the agents looking inside the bags. After voluntarily answering certain other questions about the contents of the apartment, Patino told the agents they could go inside. Patino unlocked the door with the set of keys he held, and once in the apartment told the agents that he had no objection to their looking around to determine if there was anything there of an illegal nature. He stated he had no objection since he claimed it wasn't his apartment. Until this time, the agents had neither frisked Patino nor touched him in any manner. Only two agents were present.

Thereafter, other agents arrived and conducted a thorough examination of the apartment. During the search, Patino sat in the living room and answered again that he had no objection to a search of the maroon bag since he disclaimed ownership of its contents with the exception of a small leather bag containing his wallet and a newspaper.

The court's independent observation of Patino when he testified during the suppression hearing supports the finding that he was in no manner overborne and that his consents were freely and voluntarily given. Patino appeared a composed and mature man of approximately 29 years of age. He answered questions put to him responsively and intelligently. While he testified through a Spanish language interpreter, he admitted living in this country for over 12 years and speaking and comprehending English with ease. He made no claim that he at any time failed to understand what was occurring or the agents' various questions and requests. In these circumstances, the case is almost indistinguishable from the facts of *United States v. Price, supra,* 599 F.2d at 503, in which the court observed that

> "Price's disclaimer that the bag was not his and that the agents could do whatever they wanted with it was anything but ambiguous. It clearly signified consent to the requested search of the bag which had been in his exclusive possession at least from the moment he was spotted by Agent Whitmore."

Accordingly, since the court credits the testimony of the agents as to the facts surrounding Patino's consent to the searches and not his own testimony as to his subjective fears of DEA agents, the government has clearly met its burden of proving that the consents were voluntarily given.

It is the court's conclusion, moreover, that Patino also voluntarily agreed to accompany the agents to the apartment at 37–43 88th Street claimed to be his own residence. After satisfying themselves that the circumstances did not warrant further immediate investigation at 88th Street, the agents proceeded, again with Patino's agreement to 66–01 Burns Court, one of the addresses disclosed by the search of the maroon bag Patino carried out of the Union Street apartment.

The facts established at the evidentiary hearing fully support the conclusion that Patino voluntarily accompanied the agents. First, there is no suggestion in the record that he at any time requested that the agents permit him to leave. Moreover, while there can be little doubt that Patino was laboring under the knowledge of the extent of his participation in the drug organization under investigation, his behavior was consistent with a belief that his compliance with the agents' requests was the most effective manner in which to deal with his precarious situation. Finally, when confronted at Burns Court by the agents' discovery of the arsenal of weapons and drugs, Patino was wholly in control of his faculties and immediately informed the agents that he no longer desired to cooperate before speaking with an attorney. It is plain his compliance to that point was tactical and hence sufficiently voluntary to render the circumstances of his detention wholly distinguishable from those found objectionable in *Dunaway v. New York, supra.*

Having determined that Patino voluntarily accompanied the agents to the various apartments, there remains the question of the propriety of the entry into the apartment at 66–01 Burns Court. Although the government argues with some force that exigent circumstances justified the warrantless entry into the apartment,[1] we prefer a ground more consistent with the conclusions we have already reached. For the reasons stated with respect to Patino's con-

---

1. The government contends that the exigencies of the situation justified the warrantless entry. It suggests that delay in obtaining a warrant would have permitted the loss or destruction of evidence or risked loss of capturing Victor Crespo, who they "believed" was in the Burns Court apartment. In view of the court's ruling on the issue of consent, it is unnecessary to decide whether the entry was proper under *United States v. Reed, supra.*

sent to search the bags and the apartment at Union Street, Patino's disclaimer that the keys in his possession were not his and that the agents could do as they liked with them clearly signified his consent to the search of the apartment at 66–01 Burns Court that the key would open, as proposed by the agents. Having made such a disclaimer, Patino cannot be heard to complain that the evidence discovered at 66–01 Burns Court can be offered against him.[2]

■ One final point must be briefly addressed. Defendant claims that he is entitled to dismissal of the indictment because of alleged misconduct during the course of the investigation. He suggests that Detective Robinson's entry into the apartment at 41–40 Union Street on July 10, 1979, fatally tainted the indictment, and invokes the court's supervisory powers under cases such as *United States v. Jacobs*, 547 F.2d 772 (2 Cir. 1976), *cert. dismissed*, 436 U.S. 31, 98 S.Ct. 1873, 56 L.Ed.2d 53 (1978), and *United States v. Estepa*, 471 F.2d 1132 (2 Cir. 1972).

■ This "most drastic remedy," *United States v. Fields*, 592 F.2d 638 (2 Cir. 1978), *cert. denied*, 442 U.S. 917, 99 S.Ct. 2838, 61 L.Ed.2d 284 (1979), however, is justified to achieve one or both of two objectives:

> "first, to eliminate prejudice to a defendant in a criminal prosecution; second, to 'help translate the assurances of the United States Attorneys into consistent performance.'" *Id.* at 647 (footnotes omitted).

Here, there is no evidence that prejudice to the defendant, if any, is of the character that can only be cured by dismissal. In fact, although Detective Robinson's entry into the apartment may not have been

proper,[3] it is not evident that defendant suffers any prejudice since the investigation of the apartment began well · before his entry and would undoubtedly have continued notwithstanding the entry. As the government points out, the DEA investigation had already revealed that the Union Street apartment had been rented by an individual not living at the apartment but who had actually returned to South America. It had also disclosed that a person suspected of being a major figure in the cocaine traffic was listed as a reference on the lease application, and finally that the telephone at the apartment had transmitted and received calls by persons at numbers also contacted by the occupants of Victor Crespo's apartment at Wexford Terrace. In these circumstances, the illegal intrusion, if one occurred, did not taint subsequent surveillance so as to render Patino's stop and indictment fatally defective. *See United States v. Falley*, 489 F.2d 33, 40 (2 Cir. 1973).

■ Nor do we believe that the facts warrant dismissal because of any widespread or continuous abuse or official misconduct. At worst, the police officer's entry was the result of a possibly mistaken belief that the superintendent's willingness to open the door entitled him to gain access to the apartment. Since there is no evidence that the entry in fact did more than confirm the government's suspicions that the apartment was being used as part of the drug organization under investigation, the officer's single mistaken appraisal of his authority, if such was the case, cannot standing alone vitiate the entire prosecution. *See United States v. Brown*, 602 F.2d 1073 (2 Cir. 1979).

---

**2.** The government contends that Patino lacks the requisite "legitimate expectation of privacy" in both the Burns Court and Union Street apartments to confer standing to challenge the searches. *See Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978). Although defendant's assertions at the time he was stopped in the hallway in Union Street and at the hearing were inconsistent in material respects, we resolve our doubts in favor of conferring standing in view of our disposition of the merits. Here, defendant was stopped having possession of keys and money orders for

payment of rent connecting him with the apartments searched. Taken together with his assertions of ownership at the hearing, while perhaps self-serving, they are sufficient to establish defendant's right to challenge the government's actions. *See United States v. Ochs*, 595 F.2d 1247, 1253 (2 Cir. 1979).

**3.** *See Stoner v. California*, 376 U.S. 483, 84 S.Ct. 889, 11 L.Ed.2d 856 (1964); *Chapman v. United States*, 365 U.S. 610, 81 S.Ct. 776, 5 L.Ed.2d 828 (1961).

Finally, we agree that Patino's consent to searches of both his bags and the apartment at Union Street dissipated the taint, if any, of the officer's entry. See *United States v. Galante*, 547 F.2d 733, 740–42 (2 Cir. 1976), *cert. denied*, 431 U.S. 969, 97 S.Ct. 2930, 53 L.Ed.2d 1066 (1977); *United States v. Mullens*, 536 F.2d 997, 999–1000 (2 Cir. 1976).

For these reasons the defendant's motion to suppress evidence was in all respects denied.