**UNITED STATES of America, Plaintiff,**

v.

**Jackie Leon NEVITT and Edward Calligton, Defendants.**

**No. G75–275 Cr.**

United States District Court, W. D. Michigan, S. D.

March 22, 1976.

Federal Bureau of Investigation on the night of their arrest.

An evidentiary hearing was conducted on March 9, 1976. Neither defendant chose to testify at that time. The United States presented, as its witnesses, Patrol Sgt. Lanny Wilde, Detective Lloyd Erb, and FBI special agent Jerry Thomason. The defendants offered the testimony of only one witness—Officer Joseph Betts.

## I. FACTS

Sgt. Wilde is employed, as is Officer Betts, by Western Michigan University, although they are also deputy sheriffs for Kalamazoo County. At approximately 10:00 P.M. on November 29, 1975, while Wilde was putting gas in his patrol car, he overheard a radio call concerning a burglary at a credit union four miles away.[2] Although they were not yet formally requested to respond to the call, Wilde and Betts proceeded, in their separate units, to the credit union. Shortly after the initial call, Wilde was formally requested to go to the scene and he increased his speed so as to safely arrive as soon as possible. Betts followed immediately behind Wilde.

During this trip to the credit union, which is in a more rural area of the county, Wilde continued to receive information from the county dispatcher. Apparently the credit union was protected by an alarm system which included the capability of monitoring sounds coming from within the building. However, it was not the sheriff's office itself that listened to the sounds. Instead, the private citizen who actually did the monitoring called the county dispatcher when the alarm sounded. The evidence does not indicate whether the dispatcher simply relayed information received from the private citizen or whether the dis-

J. Terrance Dillon, Asst. U. S. Atty., Grand Rapids, Mich., for plaintiff.

William E. Jackson, Grand Rapids, Mich., for defendant Nevitt.

E. Lou Hoos, Grand Rapids, Mich., for defendant Calligton.

## OPINION

FOX, Chief Judge.

In this case, the two defendants are charged with entering a credit union with intent to commit a felony, in violation of 18 U.S.C. § 2113(a).[1] The defendants have jointly moved to suppress certain evidence seized by the police and

---

1. That section provides in part: "Whoever enters or attempts to enter any . . . credit union . . ., with intent to commit in such . . . credit union . . . any felony affecting such . . . credit union, and in violation of any statute of the United States, or any larceny" shall be guilty of an offense against the United States.

2. Wilde and Betts are in communication with the county dispatcher as well as the University's dispatcher.

patcher was somehow "patched in" to the monitoring equipment itself.

The initial information Wilde received from the dispatcher was that voices could be heard inside the credit union and that a "pounding" sound was also audible. In a later dispatch, Wilde was informed that at least one voice was that of a negro male, although exactly what was being said inside the credit union either could not be discerned or the content was simply not passed on to Wilde. Since the dispatcher was in all other respects prompt in relaying the totality of what was happening in the credit union, the logical conclusion is that the actual words being spoken were themselves indiscernible.

Four or five minutes after the first call, at the time Wilde was approximately one mile from the credit union, he was informed that the voices could no longer be heard inside the credit union and that a second perimeter alarm had sounded. Wilde concurred in the dispatcher's inference that the burglars had left the building. I find that such was a reasonable inference, even though other explanations may also exist for the sounding of the second alarm.

As Wilde and Betts then travelled north on Ninth Street, on which the credit union is located, a couple of cars passed them going south. Wilde directed Betts to check out those cars,[3] and Wilde continued to the credit union. Within one minute after hearing of the second alarm, Wilde drove slowly past the driveway of the credit union.[4] Looking in the direction of the credit union, Wilde saw two apparently unoccupied vehicles in the south end of the credit union's parking lot. He then turned his attention back ahead of him, to a blue fast-back Mustang parked on the shoulder of Ninth, approximately 300 feet from the credit union. The car, facing north as was Wilde, was also apparently unoccupied.

Staying on the road itself, Wilde stopped a short distance behind the Mustang and called in its license number to the dispatcher. As he slowly pulled his patrol car up so that it half overlapped the Mustang, Wilde saw that the Mustang was occupied after all. The driver, a negro male, started the car and pulled out, heading north on Ninth at a lawful speed. As soon as Wilde knew the car was occupied he decided to stop it and question the occupants. However, he also felt he should wait for a back-up unit to arrive before attempting to stop the car. As a result he proceeded to follow the Mustang.

When the Mustang turned right onto KL street, Wilde observed a second occupant—another negro male. The Mustang proceeded along KL to a spot where it turned left into an apartment complex. Fearful of losing the Mustang in the complex, and knowing that his back-up unit was rapidly approaching,[5] Wilde decided to stop the Mustang.

When Wilde activated his overhead lights, the Mustang quickly accelerated for a short distance and then pulled into a parking lot and stopped. Wilde drew his weapon, approached the Mustang, and requested the occupants to get out and put their hands on the roof of the vehicle. Eventually both complied, although the driver attempted, at first, to carry on a conversation.[6] Betts arrived and covered the occupants while Wilde patted down the driver. Two other officers arrived and pat-searched the passen-

---

3. Betts testified that he was asked to get their license numbers.

4. Wilde had turned off his overhead lights before turning onto Ninth, one and one-half miles away.

5. During this interval Wilde was also informed that the other two cars, which had been travelling south on Ninth, were not involved. Wilde was not informed as to how this determination had been made. In fact, these cars were never actually stopped. Instead, merely upon the basis of the skin color of the visible occupants, the police halted their investigation. Betts then proceeded to catch up with Wilde who had focused in on the suspects in the Mustang.

6. Wilde did not testify as to whether the driver "sounded negro" as well as being black.

ger.[7] The defendants are the two occupants of the Mustang.

After the patdowns, the defendants moved to the rear of the Mustang and Wilde looked into the car from the outside. Through the driver's window, he could see a crowbar lying on the passenger's seat. The crowbar was then seen more clearly from the passenger's side. In addition, through the rear passenger's window, Wilde observed a flashlight inside the car.

After observation of these and other items in the Mustang, the defendants were placed in separate police vehicles to await arrival of the county sheriff's units. Neither Betts nor Wilde viewed themselves as making a formal arrest although undeniably the defendants were not free to leave.

When Detective Erb of the Sheriff's department arrived he also observed the interior of the Mustang, although he likewise did not actually enter the car to make his observations. In addition to the articles mentioned above, Erb also saw the fingers of a red glove under the right front seat. The vehicle was impounded and towed to the sheriff's department garage, where it was thoroughly searched.

FBI special agent Thomason participated in the investigation at the credit union and had observed a heel print outside the credit union.[8] When Thomason later observed the heel of defendant Nevitt's shoe, Thomason thought it was similar to the print he had seen earlier. As a result Thomason seized Nevitt's shoes. Although Calligton's shoes did not match any prints found, his shoes were also seized and sent to Washington,

D. C., to be examined for the presence of paint chips and metal filings.[9]

## II.

Defendants claim (i) that their arrests were illegal for lack of probable cause, and (ii) that the seizures of their shoes were unlawful for lack of a warrant. They seek to suppress the fruits of these illegal acts.

■ If the police acted properly in stopping defendants and effecting their arrests, the evidence later seized is admissible. Seizure of such items as shoes is permissible as incident to a valid custodial arrest, *United States v. Robinson*, 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973). The seizure comes within an exception to warrant requirement (at least), even though it occurred at the station house rather than the scene of the arrest. *United States v. Edwards*, 415 U.S. 800, 94 S.Ct. 1234, 39 L.Ed.2d 771 (1974).

■ Similarly, where probable cause exists to search an auto and exigent circumstances would justify an on-the-spot search, an automobile may be removed to a police garage and searched at the latter location. *Carroll v. United States*, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925); *Chambers v. Maroney*, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970). In fact, the Supreme Court has even allowed such a procedure without discussing the necessity for exigent circumstances. See *Texas v. White*, 67 U.S. 423, 96 S.Ct. 304, 46 L.Ed.2d 209 (1975)

## III.

■ Assuming that Wilde's "drawn gun" stop and pat-down amounted to an arrest,[10] he must have had probable

---

**7.** The driver had a semi-mechanical knife on his person. The knife was 9½ inches long when opened. Neither occupant had any identification.

**8.** It had rained during a portion of November 29.

**9.** Thomason did not direct the seizure of Calligton's shoes, but he did learn of it after the fact.

**10.** While police have authority to make brief stops and then inquire as to suspects' identi-

ties or suspicious circumstances, *United States v. Brignoni-Ponce*, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975); *Adams v. Williams*, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972); *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the intrusion must be a limited one and the offensiveness of the intrusion will affect its reasonableness. See *United States v. Ortiz*, 422 U.S. 891, 95 S.Ct. 2585, 45 L.Ed.2d 623 (1975). Since *Terry*, it has been recognized that an order to exit from a stopped car does not always constitute an ar-

cause to effect such an arrest. In determining whether probable cause existed, I have given no weight to (i) the description of the burglars' race and (ii) the radio message that the cars on Ninth Street were not involved. However, I do not deem these items as crucial, either separately or together, in assessing probable cause.

Probable cause to arrest depends upon whether, at the moment the arrest was made, the facts and circumstances within the arresting officers' knowledge and of which they had *reasonably trustworthy information* were sufficient to warrant a prudent man in believing that the suspects had committed an offense. *Adams v. Williams*, 407 U.S. 143, 148, 92 S.Ct. 1921, 1924, 32 L.Ed.2d 612, 618 (1972); *Beck v. Ohio*, 379 U.S. 89, 91 (1964); *United States v. Truitt*, 521 F.2d 1174 (6th Cir. 1975) (probable cause to seize). I hold that the factors which I have disregarded in this context were not shown to be sufficiently trustworthy to be considered in determining probable cause.

No evidence was presented to the court which would support the trustworthiness of the conclusion as to the racial description of the burglars. The person who drew the conclusion did not testify and no other witness was able to testify as to why the conclusion was drawn. While I can, in the circumstances of this case, assume the trustworthiness of the person who drew the conclusion (it being either the police dispatcher or the private alarm monitorer), I have been presented with no evidence as to the basis for that conclusion. That is, what exactly was it about the voices that convinced the listener that the burglars were black, or at least that one of them was black? As noted above, in Part I, it is not clear from the evidence the United States presented that the words spoken by the burglars were even discernible. Therefore, I cannot give any weight to the conclusion as to race. Necessarily, the radio message concerning the involvement of the two cars "checked out" by Betts must also be disregarded since Betts' determination was based solely on the race of the visible occupants.

Even if there had been some evidence as to what exactly it was about the voices that caused the listener to draw his racial conclusion, I would still be reluctant to include that conclusion as a factor in determining probable cause. In *Brignoni-Ponce*, supra, the Court held that apparent Mexican ancestry could be used as a relevant factor in deciding whether to stop and question travellers concerning citizenship and immigration although it was not enough, alone, to justify such a stop. There, however, the Court specifically found, on the basis of statistical evidence, that "the likelihood that any given person of Mexican ancestry is an alien is high enough" to justify its use as a factor. 422 U.S. at 886–887, 95 S.Ct. at 2583, 45 L.Ed.2d at 620. In our case, the United States has presented no evidence as to a voice-race correlation.

Of course, statistical probability is not always required. For example, in *United States v. Truitt*, supra, the Sixth Circuit was concerned with the question of

---

rest, see e. g., *United States v. Harflinger*, 436 F.2d 928, 933 (8th Cir. 1970), cert. denied 402 U.S. 973, 91 S.Ct. 1660, 29 L.Ed.2d 137 (1971), although that may not have been the case before *Terry*. See *Henry v. United States*, 361 U.S. 98, 80 S.Ct. 168, 4 L.Ed.2d 134 (1959).

Even before *Brignoni-Ponce* made explicit what was implied in *Terry* and *Adams*, the Sixth Circuit recognized that information acquired, after a suspect was stopped and "to some extent in a custodial situation," is properly considered in determining whether there was probable cause to arrest the suspect. *United States v. Kemper*, 503 F.2d 327 (6th Cir. 1974), cert. denied 419 U.S. 1124, 95 S.Ct.

810, 42 L.Ed.2d 824 (1975). Several courts, however, have been reluctant to treat a stop where guns were drawn as less than an arrest. See, e. g., *United States v. Strickler*, 490 F.2d 378 (9th Cir. 1974); *United States v. Troutman*, 458 F.2d 217 (10th Cir. 1972); *United States v. Ramos-Zaragosa*, 516 F.2d 141 (9th Cir. 1975); *United States v. Diggs*, 522 F.2d 1310, 1326–27 n.5 (D.C.Cir.1975) (dissenting opinion). But see *United States v. Richards*, 500 F.2d 1025 (9th Cir. 1974), cert. denied 420 U.S. 924, 95 S.Ct. 1118, 43 L.Ed.2d 393 (1975), and *United States v. Diggs*, supra. It is because of the use of guns that I assume Wilde's acts amounted to an arrest.

whether there was probable cause that any sawed off shotgun is possessed illegally. That court found that it was sufficient to hold as did the trial judge that:

> " 'I think it is a matter that is pretty common knowledge, sawed off shotguns are not used by the average law abiding citizen of this community.' " 521 F.2d at 1177.

I cannot say in this case that "it is a matter of pretty common knowledge" that a person's race (or more precisely, a burglar's race) can be accurately predicted from his voice pattern. I am especially reluctant to take judicial notice of such a "fact" where, unlike in *Truitt*, the "fact" has the potential for leading to discriminatory conduct on the part of the police.[11] It may be true that where a person comes from or the extent of his education can be predicted from his voice. To the extent that blacks have a common background in these areas, it may be they have common vocal patterns, but I cannot, without further evidence, take judicial notice that the mere color of a person's skin is a factor in how he speaks. White people who have that same background will sound the same.

■ Even without using the above discussed factors, I hold that officer Wilde had probable cause to stop and arrest these defendants. Wilde knew that defendants were in an auto on the shoulder of the road, the lights off, within one minute after the time at which it could be reasonably inferred the burglars had left the credit union. The car, parked in the immediate vicinity of the credit union, started and pulled away a very short time after Wilde stopped behind it, with his headlights shining. While there may be other explanations for the sudden exit, a reasonable inference would be that the occupants had just returned from the credit union and were unable to get away before Wilde arrived. Finally, when Wilde activated his overhead lights to stop the defendants, they initially speeded up,[12] giving him additional justification for believing that the two occupants were the burglars.

The probable cause that existed with respect to these defendants is not decreased by the fact that there were other potential white suspects in the general area. The circumstances which pointed to defendants were much stronger than those which may have justified, at most, an investigatory stop of the other autos. Defendants' car was the only known occupied car parked in the immediate vicinity of the credit union. The other occupied vehicles travelling south on Ninth may have been involved, but could not be placed at the immediate scene. The vehicles parked in the credit union parking lot appeared unoccupied. Only as to defendants did the police have probable cause.

While of course probable cause must be decided on a case-by-case basis, the evidence in this case equals that found to provide probable cause in the following: *Radcliff v. Cardwell*, 446 F.2d 1141 (6th Cir. 1971); *United States v. Troutman*, 458 F.2d 217 (10th Cir. 1972); *United States v. Edwards*, 474 F.2d 1206 (6th Cir. 1973), reversed on other grounds, 415 U.S. 800, 94 S.Ct. 1234, 39 L.Ed.2d 771, vacated 497 F.2d 925 (6 Cir., 1974); see also *United States v. Diggs*, 522 F.2d 1310 (D.C.Cir.1975). In *Edwards*, the Court of Appeals found probable cause based primarily on the suspects' presence in the immediate vicinity of the burglary, at a time when few other people were on the street. The Court of Appeals also ruled that a search of the suspect at the jail after formal arrest procedures were completed was invalid. The Supreme Court reversed on the latter issue, but in doing so, based the reversal explicitly on the existence of a *valid* arrest. The evidence in the instant case is at least as compelling as that which was

---

11. As noted in the recitation of the facts, the police in this case completely and absolutely ignored all potential suspects who were white.

12. The defendants have not contradicted Wilde's testimony concerning the speed-up.

present in *Edwards*. Therefore, the arrests of defendants were valid.

## IV.

To the extent that what occurred in this case can be characterized as a form of racial discrimination, there is no evidence that it was done maliciously; that is, with the purpose or intent of harassing black citizens. None of the parties have briefed the issue as to whether, assuming there existed probable cause independent of the voice-race conclusion, the motion to suppress should nevertheless be granted. This was, instead, a concern I expressed from the bench at the conclusion of the evidentiary hearing. I now hold that the circumstances of this case do not justify suppressing the evidence. Defendants' contentions, concerning the obviously poor police practice which resulted in ignoring potential white suspects, are best left for consideration by the jury.

It is important to emphasize that the police did not limit their investigation to defendants solely because of a view that only black people commit burglaries or even that black people are more likely to commit burglaries. Instead, while the other officers unjustifiably ignored white suspects, the testimony of Sgt. Wilde was that it was the fact that the Mustang was occupied that focused his suspicion on it.[13] While Wilde was aware of the racial description which was broadcast, I do not conclude that he would not have stopped the occupants of the Mustang if they were white. Unlike Officer Betts, Wilde did not testify that white people never sound like blacks.

The recent Supreme Court case of *United States v. Brignoni-Ponce*, supra, would indicate that the error the police committed in our case was merely that of broadcasting information of insufficient trustworthiness. The Court's analysis in that case was not directed toward the issue of discrimination against Mexican-Americans, although that issue was clearly present. Instead the Court looked only to the probative force of the basis for the discrimination.

I view the discriminatory police conduct as the result of a mistake or laxity in procedures and not as deliberate and purposeful discrimination.[14] Cf. *Yick Wo v. Hopkins*, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886); *Oyler v. Boles*, 368 U.S. 448, 82 S.Ct. 501, 7 L.Ed.2d 446 (1962) (both concerning alleged discriminatory prosecutions). Because of this view, suppression of the evidence lawfully seized is unnecessary.

Therefore, IT IS ORDERED that defendants' motion to suppress certain evidence is denied.

---

13. " . . . After I knew there were occupants, if it had driven off, I would have stopped it."

14. In situations concerning racial discrimination, the required intent can often be shown by reference to the well known inference that a person intends the natural and probable consequences of his acts. That is, of course, not a conclusive presumption. In this case, I find that the necessary intent to discriminate did not exist.