**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Jose CEBALLOS, Defendant-Appellant.**

No. 784, Docket 80–1420.

United States Court of Appeals,
Second Circuit.

Argued March 23, 1981.

Decided June 29, 1981.

Harvey M. Stone, Winstanley F. Luke, Asst. U. S. Attys., Edward R. Korman, U. S. Atty., Brooklyn, N. Y., E. D. N. Y., for the United States of America.

Chester L. Mirsky (Washington Square Legal Services, New York City), for the defendant-appellant.

Before OAKES and MESKILL, Circuit Judges, and SAND,* District Judge.

SAND, District Judge:

Law enforcement officers observing what they believe to be a crime in progress often face the difficult task of determining whether the circumstances known to them justify making an investigative stop or an arrest. If they act too soon, with what is later deemed to be an insufficient basis, they risk jeopardizing the validity of subsequent legal proceedings. If they wait too long, they risk losing trace of the suspect or must engage in difficult, time consuming and often fruitless surveillance. Equally difficult is the task of determining, if a suspect is stopped, how much by way of a show of force and other precautionary measures is appropriate for the personal protection of the officers without transforming what would otherwise be deemed to be a mere investigative stop into an arrest for which probable cause is required. In holding, as we do here, that the procedures followed by the arresting officers violated appellant's rights under the Fourth Amendment, we are neither unmindful of the closeness of the question, nor of the fact that we have engaged in a studied analysis of decisions made by officers who believed they had to act with dispatch.

Our review of the record satisfies us, however, that the actions taken by the arresting officers cannot fairly be characterized as the minimally intrusive investigative stop sanctioned by *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), but rather constituted an arrest for which the officers lacked probable cause. We have been reminded by the Supreme Court in *Dunaway v. New York,* 442 U.S. 200, 210, 99 S.Ct. 2248, 2255, 60 L.Ed.2d 824 (1979), that "[b]ecause *Terry* involved an exception to the general rule requiring probable cause, this Court has been careful to maintain its narrow scope." *See also United*

*States v. Brignoni-Ponce,* 422 U.S. 873, 880, 95 S.Ct. 2574, 2579, 45 L.Ed.2d 607 (1975) (border investigative stop "justified on facts that do not amount to the probable cause required for an arrest" in view "of the limited nature of the intrusion....").

### I.

This is an appeal from a judgment of the United States District Court for the Eastern District of New York upon a plea of guilty to an indictment charging appellant with possession of 125 grams (approximately 4½ oz.) of cocaine with intent to distribute. The district court, Mishler, J., after holding a hearing, denied appellant's motion to suppress the cocaine seized at the time of his arrest and to suppress inculpating statements made by appellant to the arresting officers. Appellant preserved the right to appeal this ruling.[1]

A member of the New York City Police Department on assignment to the New York drug task force, William J. Frawley, and a special agent of the Drug Enforcement Administration, Robert Polumbo, testified at the hearing on the motion to suppress. Officer Frawley testified that information received from a confidential informant of known reliability led him to establish surveillance of apartment 5–A at 42–22 Ketcham Street in Queens. The apartment was under surveillance during April and May of 1980. The apartment in question was on the ground floor and the officers were able to observe persons come and go in the apartment and engage in transactions involving the exchange of currency. The events relating to 42–22 Ketcham Street were pertinent most immediately to the arrest of co-defendant Victor Abrue. Abrue, who was arrested on May 13, 1980, moved to suppress other evidence, and the hearing on his motion and on that of the appellant were combined. The district court granted Abrue's motion to suppress

---

* Honorable Leonard B. Sand, United States District Judge for the Southern District of New York, sitting by designation.

1. Ceballos was sentenced to one year and one day and a special parole term of 15 years, and a special condition of this parole is that if he is deported or leaves the United States, he is not to re-enter the United States illegally.

and the relevance of 42–22 Ketcham Street and the events which there occurred are pertinent to this appeal only insofar as they furnish the basis for the officers' belief that another co-defendant, Daisy Zea, was trafficking in drugs from that location and that her customers were hispanic males. At no time was the appellant Ceballos ever observed at the Ketcham Street premises.

Officer Polumbo testified that after Abrue's arrest, surveillance was re-located to 223rd Street in Bayside in the belief that Daisy Zea had moved her drug operations to that location. 43–35 223rd Street, the premises in question, is a three story dwelling, in which one family occupies each floor. The surveilling officers could not see inside the building and did not know to which floor someone entering the building would go. Checks performed by the officers with utility companies servicing the building enabled them to establish that Daisy Zea was in the second floor apartment and she was actually seen in that apartment when the shades were up. The landlord of the building was believed by the officers to be a man of Indian extraction who had originally lived on the ground floor but apparently had moved within the building. During the period from May 20th when the surveillance began until the day of appellant's arrest, June 18, 1980, Daisy Zea and her brother were observed by the surveilling officers parking their vehicle two or two and one-half blocks away from the house, although closer legal parking was available. They were also observed driving erratically, as if to avoid surveillance.

On June 18, 1980 at 5:00 P.M., Daisy Zea was seen driving away with another female. The officers maintained surveillance of this vehicle, but discontinued the surveillance after Zea began driving erratically. The officers then returned to surveillance at 223rd Street. Here, sometime later, Mrs. Zea and the other female were seen to return to the house, Mrs. Zea carrying a hat box and a plastic bag. Later that evening, a van pulled up in front of the house and a hispanic male alighted from the vehicle, entered the house, exited "a while later", and drove off. No surveillance was attempted of this individual.[2] At approximately ten minutes to eleven, the appellant was seen to drive up and park in front of the residence. Officer Polumbo was on surveillance, from a vantage point some 35 to 45 yards diagonally across the street from the building, in a parking lot. However, from his vantage point he could not observe persons entering or leaving the building. This observation was conducted by Officer Ramos, who was in radio communication with Polumbo. Although Officer Ramos was in court on the day of the hearing and was apparently to have been a witness, he was "called away" and did not testify. As a consequence, the sole testimony concerning the officers' observations of the appellant prior to his being stopped consists of Polumbo's repetition of what he had been told over the radio by Ramos.

Polumbo testified, based on what the officers were told by Ramos, that:

"A hispanic male alighted the vehicle and he got onto the curb in front of the residence. He looked in both directions in a curious manner, if you will. He then went into the residence. He was carrying nothing in his hands that we observed.

Approximately five minutes or so later, maybe ten minutes, he was again observed to exit the house. This time, he was carrying a small brown paper bag in his hand. Again, he looked in all directions." (Tr. at 86).

No attempt was made by the officers to make a *Terry* stop of Ceballos while he was on the street, bag in hand, and before he got into his automobile, for reasons which do not appear.[2A] Ceballos got into his car

2. After Ceballos' arrest and the officers' subsequent entry into Zea's apartment, this van and driver returned. The driver was questioned by the officers and released.

2A. Ceballos had parked directly in front of the premises and there may not have been sufficient time for the officers to stop him before he entered the automobile. The officers may also have been concerned that any such action

and was followed to the vicinity of Northern Boulevard and 218th Street where he stopped for a traffic light. At this time, the further progress of his car was blocked by at least three vehicles driven by law enforcement officers. Officer Polumbo, whose vehicle was to the rear of Ceballos', exited and approached the vehicle. Polumbo testified that Ceballos was

"looking up at myself and other officers and I noted between his legs was a brown paper bag. He was asked to get out of the vehicle, motioned to get out of the door end up [sic]. He got out, he swung out, when he did the brown paper bag fell from between his legs and onto the pavement. At that particular time, Sergeant Colivato bent down and retrieved the brown paper bag. The contents therein contained a white powder contained in a glassine envelope. Mr. Ceballos at that time was officially placed under arrest." (Tr. at 88).

Thereafter, Officer Ramos advised Ceballos of his rights, following which Ceballos made inculpatory statements to the effect that he had received the cocaine from a person known as Daisy on the second floor at 223rd Street. On cross-examination, Polumbo testified that "at least three vehicles" manned by officers were used to effect the stopping of appellant's vehicle, one in front and two to the rear. The first person who approached Ceballos, Sergeant Colivato, spoke to him in English. As to a display of firearms, Polumbo was asked:

"Well, sir, did anyone take out their guns and train it in the area in which Mr. Ceballos was at the time you were behind him and Ramos car was in front of him.

Answer: Other Officers might have, yes."[3] (Tr. at 114.)

After the hearing, the district court denied Ceballos' motions. Although not explicitly discussing the inculpating statement, the district court found that the Government made a sufficient showing of "specific objective and articulable reasons" for an investigatory stop under Terry v. Ohio, supra. The district court found the circumstances surrounding Ceballos' visit to have "amounted to more than mere suspicion that he had just engaged in a narcotics transaction" because he fit the profile of Zea's customers, because he entered and exited the building cautiously, because he only spent five to ten minutes in the house at 11:00 P.M., and because he carried a small brown paper bag when he left the building.[4]

II.

The contentions of the parties may be simply stated. It is undisputed that a seizure within the meaning of the Fourth Amendment occurred. The Government contends that when the officers blocked the progress of Ceballos' car and approached with guns drawn they were performing an investigative stop which was supported by reasonable suspicion based on the information known to them, and that the circumstances immediately thereafter (the bag falling to the ground, being partially open and the glassine envelope with white powder being visible) furnished probable cause for an arrest. With respect to the force employed by the officers (blocking Ceballos'

might have been observed from the window of Zea's apartment, thereby prematurely disclosing the surveillance. These considerations are, however, mere surmise on our part, the matter not having been the subject of inquiry at the suppression hearing.

3. The district court did not make a finding with respect to whether guns were drawn by the officers as they approached Ceballos' vehicle, and Polumbo's testimony is at best inconclusive. See Tr. at 115 ("after the arrest was made or at that particular time [i. e., when Polumbo was approaching Ceballos' vehicle] there were officers there with the weapon [sic]

out.") For the purposes of this appeal, the Government has accepted the proposition that at least some of the officers had their guns drawn, see Brief for Appellee at 9, and we deal with the case on that basis, without precluding further inquiry on remand.

4. Although the district court stated that the time and duration of the visit and his carrying of a brown paper bag "may have established probable cause to believe that Ceballos was in possession of narcotics," the district court explicitly determined only that a valid Terry stop had occurred, without determining precisely when the arrest occurred.

vehicle and drawing guns), the Government argues that the intrusion was justified by the seriousness of the suspected offense, the officers' fears for their personal safety, and the possibility that Ceballos would have fled, with a resulting high speed chase which might have endangered bystanders. Appellant argues that the arrest in fact took place when at least three vehicles blocked appellant's way and he was confronted by several officers, some of whom had drawn guns, and that at that point, the officers lacked probable cause to arrest appellant.

We are thus called upon to decide whether the appellant was subjected to an "investigatory stop" governed by the reasonable suspicion test established in *Terry v. Ohio, supra,* or whether he was subjected to such a degree of force that the stop was in fact an arrest governed by the requirement of probable cause. For the reasons stated herein, we conclude that appellant was arrested when the police officers blocked the progress of his car and approached with drawn guns, and that such arrest was unsupported by probable cause. Accordingly, we reverse and remand for further proceedings not inconsistent with this opinion.[5] This being true, we need not reach the question whether indeed there were sufficiently specific, objective, and articulable reasons for subjecting Ceballos to an investigatory stop, *see, e. g., United States v. Beneventura-Ariza,* 615 F.2d 29, 33 (2d Cir. 1980).

### A.

This Court has had occasion quite recently to canvass thoroughly the law concerning investigative stops in narcotics cases similar to this one. *United States v. Vasquez,* 638 F.2d 507 (2d Cir. 1980). We accept the principles set forth in *Vasquez*[6] and our conclusion that the same arresting officers who were there found to have been in compliance with the Fourth Amendment, here

---

**5.** We note that although the district court had before it a motion to suppress the paper bag which contained the cocaine, and a motion to suppress statements made by appellant after he was stopped and the bag was seized, appellant's counsel stated at the conclusion of the hearing that the Court should deal only with the Fourth Amendment issue with respect to Ceballos, and the district court therefore did not separately discuss the motion to suppress appellant's statements. It was apparently assumed below that if the officers' actions violated appellant's Fourth Amendment rights, both the bag and Ceballos' statements would be suppressed. We find this assumption valid in view of the fact that the bag was seized incident to the arrest, and Ceballos made the statements immediately after he was approached and ordered out of his car, and while several officers were pointing guns at him. *See Brown v. Illinois,* 422 U.S. 590, 603–04, 95 S.Ct. 2254, 2261–62, 45 L.Ed.2d 416 (1975); *United States v. Tucker,* 610 F.2d 1007, 1012–13 (2d Cir. 1979).

**6.** In the court's statement of the applicable law in *Vasquez,* Judge Kearse wrote:

"Law enforcement officers may of course briefly stop a person without arresting him; to the extent, however, that the stop has the effect of restraining the individual's freedom to walk away, the Fourth Amendment requires that the stop be reasonable. *E. g., Terry v. Ohio,* 392 U.S. 1, 16 [88 S.Ct. 1868, 1877, 20 L.Ed.2d 889] ... (1968); *see Brown v. Texas,* 443 U.S. 47, 50 [99 S.Ct. 2637, 2640, 61 L.Ed.2d 357] ... (1979). Whether or not this standard of reasonableness is met depends principally on two factors: the basis for the stop and the degree to which the stop restrains the individual.

As to the first element, a detention does not comply with the Fourth Amendment unless the officers were 'aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion' that the individual was engaged in criminal activity. *United States v. Brignoni-Ponse,* 422 U.S. 873, 874 [95 S.Ct. 2574, 2577, 45 L.Ed.2d 607] ... (1975) .... The second factor in evaluating the reasonableness of a detention is the degree of intrusion into the individual's freedom. The greater the intrusion, the stronger the basis for the officers' action must be. In *Dunaway v. New York,* 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979), for example, the police took a suspect from his home to the police station and kept him there for questioning. While the suspect was not technically under arrest, neither was he free to leave. The court held this detention too intrusive to be justifiable on the basis of mere reasonable suspicion. The suspect's liberty was sufficiently curtailed that, in order to be reasonable under the Fourth Amendment, probable cause was required. *Id.* at 216, 99 S.Ct. at 2258 .... In general, if probable cause is lacking, the intrusion must be no greater than the circumstances require." 638 F.2d at 520.

over-stepped the bounds, is based not on any differing views as to the law, but rather upon the application to the facts of this case of the *Vasquez* principles and of the "important principle that a maximal intrusion, even if technically short of arrest, must be based on probable cause." *United States v. Vasquez*, 612 F.2d 1338, 1345 (2d Cir. 1979), *cert. denied* 447 U.S. 907, 100 S.Ct. 2991, 64 L.Ed.2d 857 (1980). *See United States v. Price*, 599 F.2d 494, 499 (2d Cir. 1979). Moreover, Judge Kearse pointed out in *Vasquez, supra*, 638 F.2d at 521, that

"[i]n several cases, officers' approaches to automobiles have been held to be so intrusive as to constitute or be tantamount to arrests, for which probable cause is required." *Id.* (citing cases).[7]

■ Thus, the initial question before us is whether the blocking of appellant's car and the approach by the officers with guns drawn was so intrusive as to be tantamount to an arrest.[8] This question must be resolved based on the particular facts of this case, *see Sibron v. New York*, 392 U.S. 40, 67, 88 S.Ct. 1889, 1904, 20 L.Ed.2d 917

7. *See id.* at 522 (arrest occurred when "officers leveled their guns at the Mesas and ordered them out of their car."); *United States v. Williams*, 630 F.2d 1322, 1324–25 (9th Cir. 1980) (arrest occurred when defendants told at gunpoint to come out of motor home, were frisked and placed in border patrol vehicle), *cert. denied* 449 U.S. 865, 101 S.Ct. 197, 66 L.Ed.2d 83 (1980); *United States v. Johnson*, 626 F.2d 753, 755 (9th Cir. 1980) (arrest occurred when defendant first faced with officers at door of his home with guns drawn); *United States v. Beck*, 598 F.2d 497, 502 (9th Cir. 1979) (arrest complete when nine officers ordered taxi off road, surrounded and removed passengers from vehicle, although guns not drawn); *United States v. Wilson*, 569 F.2d 392, 394 (5th Cir. 1978) (arrest occurred when defendant in car approached with guns drawn, although not told under arrest); *United States v. Ramos-Zaragosa*, 516 F.2d 141, 144 (9th Cir. 1975) (arrest occurred when "agents, at gunpoint, under circumstances not suggesting fears for their personal safety, ordered the appellant and his passenger to stop and put their hands up."); *United States v. Larkin*, 510 F.2d 13, 14 (9th Cir. 1974) (confrontation with a vehicular blockade and drawn weapons constituted arrest, not an investigative stop); *United States v. Strickler*, 490 F.2d 378, 379–80 (9th Cir. 1974) (arrest occurred when three police cars surrounded defendant's parked car and one officer, with gun drawn, approached defendant and ordered him to raise his hands); *United States v. Lampkin*, 464 F.2d 1093, 1095 (3d Cir. 1972) (gunpoint approach constituted arrest); *United States v. Troutman*, 458 F.2d 217, 220 (10th Cir. 1972) (arrest occurred when two police cars converged on car on highway with lights flashing and officers drew guns); *United States v. Birdsong*, 446 F.2d 325, 328 (5th Cir. 1971) (arrest occurred when defendant ordered out of parked car, surrounded, and ignition key removed by officers); *United States ex Rel. Walls v. Mancusi*, 406 F.2d 505, 508–09 (2d Cir.) (arrest occurred when officer ordered suspect out of truck at gunpoint.) *cert. denied* 395 U.S. 958, 89 S.Ct. 2099, 23 L.Ed.2d 745 (1969); *United States v. Whitlock*, 418 F.Supp. 138, 142 (E.D.

Mich.1976), *aff'd without op.* 556 F.2d 583 (6th Cir. 1977) (arrest occurred when car blocked while backing out of driveway, officers' guns drawn); *United States v. Nevitt*, 409 F.Supp. 1075, 1078 n.10 (W.D.Mich.1976) (assuming arrest because guns drawn when defendants asked to leave car) *aff'd without op.* 549 F.2d 803 (6th Cir. 1976). *Cf. United States v. Jackson*, 652 F.2d 244, 249 (2d Cir. 1981) ("nothing in the record indicates that [the officer] ever pointed [his drawn gun] at Jackson.").

8. This question was not explicitly addressed by the district court. However, on cross-examination by appellant's counsel, Polumbo testified as follows:

"Q. Who is in charge of this group of officers making the surveillance?
A. We have a sergeant that was out there at the time.
Q. Who was that?
A. Sergeant Colivato.
Q. Who made the decision to move in on Ceballos at that time after he left the residence and got in his car?
A. Myself and Sergeant Colivato.
Q. Did you speak to Colivato?
A. That is correct . . . .
Q. What did you tell him, what did he say to you?
A. We discussed the situation quickly in the apartment. Based upon what Detective Ramos said we decided to stop and arrest Mr. Ceballos.
Q. You decided to arrest Mr. Ceballos, didn't you.
A. Stop him and question him at that particular time."

Tr. at 110–11. Of course, the subjective intent of the officers is not the controlling factor, rather the question before us is whether the objective circumstances constituted an arrest. *United States v. Beck, supra*, 598 F.2d at 500; *United States v. Oates*, 560 F.2d 45, 58 (2d Cir. 1977); *Taylor v. State of Arizona*, 471 F.2d 848, 851 (9th Cir. 1972), *cert. denied*, 409 U.S. 1130, 93 S.Ct. 948, 35 L.Ed.2d 262 (1973).

(1968); *United States v. Vasquez, supra*, 638 F.2d at 521, and the degree of intrusion, the amount of force used, and the extent to which appellant's freedom of movement was curtailed. *See United States v. Vasquez, supra*, 638 F.2d at 520; *United States v. Harrington*, 636 F.2d 1182, 1186 (9th Cir. 1980); *United States v. Johnson*, 626 F.2d 753, 755 (9th Cir. 1980); *United States v. Beck*, 598 F.2d 497, 500–01 (9th Cir. 1979).

■ This is not a case, such as in an airport stop, in which the officers politely approach an individual and ask a few questions in a minimally intrusive manner, without drawing their guns or otherwise limiting the suspect's freedom of movement.[9] Nor is it a case where the use of force was precipitated by the actions of the detainee.[10] Rather, in this case, the officers articulated no facts which they viewed as creating a

**9.** *See United States v. Ocampo*, 650 F.2d 421, 428 (2d Cir. 1981) ("Prior to arresting him the agents merely halted [Otero's] movements and asked him to identify himself. No guns were drawn before the agents identified him. These actions were consistent with the limited investigative stop sanctioned in *Terry v. Ohio* . . . ."); *United States v. Forero-Rincon*, 626 F.2d 218, 224 (2d Cir. 1980) (minimally intrusive stop in public place; no indication of intimidation, harassment or humiliation of appellants); *United States v. Vasquez, supra*, 612 F.2d at 1340, 1341, 1343 (minimally intrusive stop, no weapons displayed, "no evidence of harassment, intimidation, physical restraint, humiliation or prolonged questioning"); *United States v. Price*, 599 F.2d 494, 502 (2d Cir. 1979) (same); *United States v. Oates, supra*, 560 F.2d at 57 (appellants were not yet arrested when customs officers, who did not approach with guns drawn, politely requested appellants to accompany them to a private room at airport); *United States v. Magda*, 547 F.2d 756, 759 (2d Cir. 1976) (minor intrusion, officer "did not attempt to harass or intimidate Magda . . . did not physically restrain [him] nor humiliate him in any way; he simply asked him to stop.") *cert. denied*, 434 U.S. 878, 98 S.Ct. 230, 54 L.Ed.2d 157 (1977); *United States v. Patino-Zambrano*, 482 F.Supp. 245, 254 (E.D.N.Y. 1979) (investigative stop not transformed into arrest where guns not drawn, no physical restraint or humiliation) *aff'd without op.* 633 F.2d 208 (1980). *Cf.* n.7, *supra*.

**10.** *See United States v. Vasquez, supra*, 638 F.2d at 523 (officers' placing of restraining hands on Sanchez not unduly intrusive because precipitated by "fidget[ing]"); *United States v. Moore*, 638 F.2d 1171, 1174 (9th Cir. 1980) (policemen's show of force, which was precipitated by the action of the taxi driver and was necessary to prevent appellants from driving away, did not transform stop into arrest); *United States v. Vargas*, 633 F.2d 891, 896 (1st Cir. 1980) (boxing in of appellant's vehicle and immediate order to raise hands did not constitute arrest in view of evasive driving and agent's safety concerns); *United States v. Soto*, 591 F.2d 1091, 1099 (5th Cir. 1979) (stop and frisk for firearms did not constitute arrest when suspect previously apprehended was armed), *cert. denied*, 444 U.S. 845, 100 S.Ct. 89, 62 L.Ed.2d 58 (1979); *United States v. Bull*, 565 F.2d 869, 870–71 (4th Cir. 1977) (drawn gun did not transform stop of two burglary suspects in a deserted shopping center into arrest) *cert. denied*, 435 U.S. 946, 98 S.Ct. 1531, 55 L.Ed.2d 545 (1978); *United States v. Thompson*, 558 F.2d 522, 524 (9th Cir. 1977) (weapon not drawn until officers had identified themselves, ordered vans to stop, and one van suddenly lurched forward), *cert. denied*, 435 U.S. 914, 98 S.Ct. 1466, 55 L.Ed.2d 504 (1978); *United States v. Coades*, 549 F.2d 1303, 1305 (9th Cir. 1977) (drawing of guns did not transform stop into arrest in view of officers' information that the two men were armed and fleeing an attempted bank robbery in which shots were fired); *United States v. Russell*, 546 F.2d 839, 841 (9th Cir. 1976) (investigative stop not transformed into arrest by fact that customs officers were holding shotguns, one visible, one not, because circumstances suggested danger of "ambush"); *United States v. Worthington*, 544 F.2d 1275, 1280 (5th Cir. 1977) (blocking plane and approaching appellant's plane on deserted airstrip with drawn gun did not constitute arrest), *cert. denied*, 434 U.S. 817, 98 S.Ct. 55, 54 L.Ed.2d 72 (1977); *United States v. Diggs*, 522 F.2d 1310, 1314 (D.C.Cir.1975) (approach with guns drawn to car occupied by three suspected bank robbers was reasonable precaution in investigating "powerful suspicions"), *cert. denied*, 429 U.S. 852, 97 S.Ct. 144, 50 L.Ed.2d 127 (1976); *United States v. Maslanka*, 501 F.2d 208, 213 (5th Cir. 1974) (investigatory stop not transformed into arrest when officer drew revolver and approached car after 100 mile per hour chase precipitated by defendant's flight at the sight of unmarked car), *cert. denied*, 421 U.S. 912, 95 S.Ct. 1567, 43 L.Ed.2d 777 (1975); *United States v. Richards*, 500 F.2d 1025, 1028, (9th Cir. 1974) (drawing of gun to prevent plane from taking off did not convert investigatory stop into arrest where agent drew gun "only after appellant failed to comply with the first order" and officers had seen a rifle scabbard loaded on the plane), *cert. denied*, 420 U.S. 924, 95 S.Ct. 1118, 43 L.Ed.2d 393 (1975); *United States v. Balsamo*, 468 F.Supp. 1363, 1384–85 (D.Me.1979) (officers' armed approach to vehicle backing away from road block late at night in a remote area, with knowledge that a large criminal enterprise was underway, did not constitute arrest).

need for the use of force and a degree of intrusion beyond that generally employed in *Terry* stops. Although we agree with Judge Mishler and our dissenting brother that narcotics traffickers are often armed and violent, *see United States v. Oates*, 560 F.2d 45, 62 (2d Cir. 1977) ("we have recognized that to 'substantial dealers in narcotics' firearms are as much 'tools of the trade' as are most commonly recognized articles of narcotics paraphernalia.") (citation omitted), that generalization, without more, is insufficient to justify the extensive intrusion which occurred in this case. If it were, any narcotics suspect, even if unknown to the agents and giving no indication that force is necessary, could be faced with a "maximal intrusion" based on mere reasonable suspicion. The Fourth Amendment requires more to justify a "maximal intrusion." Similarly, the seriousness of the suspected offense cannot, without more, provide the basis for an intrusive *Terry* stop or for an arrest. *See United States v. Ocampo*, 492 F.Supp. 1211, 1230–31 (E.D.N.Y. 1980) *aff'd in part, rev'd in part on other grnds. as to other defendants*, 650 F.2d 421 (2d Cir. 1981).[11] And the fact that Ceballos was in an automobile does not justify the intrusiveness of the tactics utilized here; for all that appears he could have been stopped on the street before he entered his car.

Moreover, Ceballos was completely unknown to the officers, was not reputed to be a major narcotics violator, *see United States v. Santana, supra*, 485 F.2d at 368; was not known to be armed or reasonably suspected of being armed; did not engage in erratic driving designed to avoid surveillance, and did not otherwise act in a way that would lead the officers reasonably to conclude that the degree of force used here was required to effect a *Terry* stop. Rather, based on the fact that Ceballos entered a three family building at 11:00 P.M., exited 5 to 10 minutes later carrying a small paper bag, looked up and down the block "in a curious manner" and was hispanic (*i. e.*, fit the alleged "profile" of Zea's customers), he was subjected to an intrusion which, although not technically an arrest, was sufficiently akin to a traditional arrest to require probable cause. *See* n.7 *supra.* The drawing of guns has been explicitly described as one of the "trappings of a technical formal arrest", *Dunaway v. New York*, 442 U.S. 200, 215 & n.17, 99 S.Ct. 2248, 2258 & n.17, 60 L.Ed.2d 824 (1979);[12] while the failure to draw guns or otherwise use force has been relied on to distinguish *Terry* stops from arrests requiring probable cause.[13]

■ We thus conclude that the blocking of Ceballos' car and the approach of the officers with guns drawn does not fit within the "narrow exception developed in *Terry v. Ohio . . .* to the general rule requiring probable cause." *United States v. Vasquez-Santiago*, 602 F.2d 1069, 1072 (2d Cir. 1979) (per curiam), *cert. denied* 447 U.S. 907, 100 S.Ct. 2991, 64 L.Ed.2d 857 (1980). Rather, we conclude that Ceballos was arrested at the moment the progress of his car was blocked and he was faced by the officers with their guns drawn and ordered out of his car.

### B.

The next question is whether the arrest was supported by probable cause, which "exists where 'the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves

---

11. *Cf. United States v. Jackson, supra* note 7, at 249 (not unreasonable for police officer to draw gun when approaching suspected "escaping armed bank robber").

12. *See United States ex rel. Robinson v. Fay*, 239 F.Supp. 132 (S.D.N.Y.1965) (drawing of gun by officer was "the ancient instinct of a peace officer to bring the apparent transgressor to stand—*i. e.*, to place him in an effective state of arrest.") *aff'd in open court* (2d Cir. July 26,

1965) *cert. denied*, 382 U.S. 998, 86 S.Ct. 587, 15 L.Ed.2d 485 (1966).

13. *United States v. Ocampo, supra* note 9, at 650 F.2d 428–429; *United States v. Vasquez, supra*, 638 F.2d at 522; *United States v. Vasquez, supra*, 612 F.2d at 1341, 1343; *United States v. Oates, supra*, 560 F.2d at 57; *United States v. Patino-Zambrano, supra*, 482 F.Supp. at 254.

to warrant a man of reasonable caution in the belief that' an offense has been or is being committed [by the person to be arrested]." *Brinegar v. United States*, 338 U.S. 160, 175–176, 69 S.Ct. 1302, 1310–11, 93 L.Ed. 1879 (1949), quoting *Carroll v. United States*, 267 U.S. 132, 162, 45 S.Ct. 280, 288, 69 L.Ed. 543 (1925). *Dunaway v. New York*, 442 U.S. 200, 208 n.9, 99 S.Ct. 2248, 2254 n.9 60 L.Ed.2d 824 (1979). *See United States v. Webb*, 623 F.2d 758, 761 (2d Cir. 1980).

▉ The facts known to the agents: that Ceballos entered the three family house in which Zea lived at 11:00 P.M., left 5 to 10 minutes later carrying a paper bag,[14] looked up and down the street "in a curious manner" and was hispanic (allegedly the "profile" of Zea's customers), did not provide probable cause for Ceballos' arrest. We need not decide whether these facts might have justified a *Terry* stop in the absence of erratic driving or other suspicious conduct which was present in the recent narcotics cases in which investigative stops have been upheld.[15] They did not provide probable cause to believe he was committing a crime. Moreover, while the brown paper bag has been described as a common container for narcotics, the carrying of a paper bag does not provide an "objective basis" from which it can be reasonably concluded that a narcotics offense is being committed. *See United States v. Webb, supra*, 623 F.2d at 761. At most, it is an indication that an investigatory stop should be made or that other further investigation or surveillance should be undertaken. *See United States v. Buenaventura-Ariza, supra*, 615 F.2d at 36 & n.14; *United States v. Rico*, 594 F.2d 320, 326 (2d Cir. 1979).[16] Nor can the short duration of a visit without more facts than were known to the agents here provide probable cause for arrest. *Cf. United States v. Vasquez, supra*, 638 F.2d at 536 (as to appellant Amparo Medina, probable cause found where: her name appeared in records indicating she was a major narcotics customer; she was seen making suspicious delivery to another suspected narcotics trafficker; she visited same apartment at which two others were arrested in possession of cocaine; her husband left home with a bag containing cocaine just after she returned from that partment); *id.* at 530 n.15 (as to appellant Vasquez, probable cause found where: he, upon leaving same building, was recognized by officer as a suspected major narcotics dealer he had previously arrested, and when officer called out to him to stop, Vasquez crossed street and walked swiftly away); *United States v. Rosario*, 638 F.2d 460, 462 (2d Cir. 1980) (probable cause found where officers observed a plastic bag containing a substance which looked like cocaine, which was furtively carried from house to car and exhibited to two men for inspection).

Finally, the Government's contention that Ceballos fit an alleged "profile" of Zea's customers (hispanic males) is an inappropri-

---

**14.** The count of the indictment in question relates to 4½ oz. of cocaine, which is quite small in bulk. Although one of course wonders why such an object would not have been pocketed or otherwise concealed, we accept for these purposes (as the district court did in its opinion denying the motion to suppress) the credibility of this testimony.

**15.** *See United States v. Delos-Rios*, 642 F.2d 42, 45 (2d Cir. 1981) (apparent attempt to avoid being seen entering house together; "unusual and furtive behavior in getting rid of the bag when [an] unexpected car appeared."; *United States v. Vasquez, supra*, 638 F.2d at 522 (driving off in fits and starts, checking mirror for surveillance), at 523 (on same day three others in possession of cocaine arrested, two after leaving same apartment, one after wife left same apartment, Sanchez "fidget[ed]" after dropping bag); *United States v. Vasquez*, 634 F.2d at 42 (block circling, evasive driving, agents recognized car); *United States v. Gomez, supra*, 633 F.2d at 1004–05 (series of short stops, "strange behavior" while making a call before entering building).

**16.** There is no indication in the record that further surveillance of Ceballos, who was not driving erratically or otherwise attempting to avoid surveillance, could not have been undertaken by some or all of the officers in "at least three vehicles". *Cf. United States v. Price, supra*, 599 F.2d at 500 (after following taxi in which appellant was riding, agents stopped him at the door of a large apartment building; they did not know his name or address and had no other way of obtaining information).

ate attempt to broaden the limited acceptance which has been given to the DEA's drug courier profile in the context of airport *Terry* stops. In the airport context, the profile, based on the DEA's institutional experience, has been recognized as a valid basis for further investigation, but it has been held insufficient in and of itself to constitute either reasonable suspicion, *United States v. Buenaventura-Ariza, supra,* 615 F.2d at 37 n.16,[17] or probable cause, *United States v. Price, supra,* 599 F.2d at 500–01 (2d Cir. 1979).

Having concluded that Ceballos was arrested at the moment his vehicle was blocked with the display of force and authority assumed to be present here, *see* n.3, *supra,* and having further concluded that the officers lacked probable cause to arrest Ceballos at this point, we reverse the decision below and remand for further proceedings consistent with this opinion.

MESKILL, Circuit Judge (dissenting):

I respectfully dissent.

I would hold that the stop of the defendant under the circumstances presented here was reasonable and that his subsequent arrest was clearly based upon probable cause. The majority does not dispute that the officers involved possessed "specific, objective and articulable reasons for subjecting [Ceballos] to an investigatory stop." *United States v. Buenaventura-Ariza,* 615 F.2d 29, 33 (2d Cir. 1980); *see Adams v. Williams,* 407 U.S. 143, 146, 92 S.Ct. 1921, 1923, 32 L.Ed.2d 612 (1972); *Terry v. Ohio,* 392 U.S. 1, 21, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889 (1968). Indeed, the facts of this case clearly illustrate that the officers' suspicion was justified. Daisy Zea, one of the occupants

at the Bayside residence which Ceballos visited on the night of his arrest, had been under surveillance for approximately two months prior to the defendant's arrest. The investigation had beyond any question furnished the officers with probable cause to believe that Zea was engaging in narcotics trafficking.[1] The record reveals that the building into which Ceballos entered on June 18, 1980 was a three-family home and that Zea resided on the second floor. Based upon the task force members' prior observations of Zea's activity, they knew that she conducted her business at her home, that the transactions only lasted a few minutes, and that her customers were Hispanic males.

On the night of June 18, the officers observed a van driven by a Hispanic male pull up in front of the residence. The driver exited the vehicle, entered the house, and then left a short while later. About ten minutes thereafter, Ceballos, also a Hispanic male, pulled up in front of the residence. He alighted from his car, "looked in both directions in a curious manner," according to one of the officers, and entered the house. The officers, however, did not see into which of the three apartments within the house Ceballos entered. Ceballos was observed entering the house empty-handed, but upon exiting about five minutes later, he was seen carrying a small brown paper bag. "Again he looked in all directions," and then got into his car and left.

Surely, reasonable suspicion to stop and question Ceballos existed at that point. The time of night, the reasonable cause to believe that narcotics activity was ongoing in one of the three apartments, the defend-

---

17. *See Reid v. Georgia,* 448 U.S. 438, 440, 100 S.Ct. 2752, 2753, 65 L.Ed.2d 890 (Sup.Ct.1980); *United States v. Mendenhall,* 446 U.S. 544, 565 n.6, 100 S.Ct. 1870, 1877 n.6, 64 L.Ed.2d 497 (1980); *United States v. Rico,* 594 F.2d 320, 326 (2d Cir. 1979).

1. From mid-April until May 13, 1980, task force members frequently observed Zea conducting what appeared to be narcotics transactions at her previous residence. Following the arrest of one of Zea's customers, she moved to the Bayside three-family house. Surveillance of Zea

continued from May 20, 1980 until June 18, 1980. Throughout this period Zea and her brother were observed driving a car in an erratic manner and suspiciously parking it at an unusual distance from their home. On June 18, 1980, the day of Ceballos' arrest, Zea and another woman were again observed driving in an erratic manner. Zea parked her car several blocks from her residence and entered her house carrying a hat box and a beige-colored bag.

ant's furtive behavior before entering and after exiting the house, the duration of the suspect's stay, that the suspect entered empty-handed but left carrying a small brown paper bag, the "hallmark" of the drug trade, *United States v. Santana*, 485 F.2d 365, 368 (2d Cir. 1973), *cert. denied*, 415 U.S. 931, 94 S.Ct. 1444, 39 L.Ed.2d 490 (1974); *see also United States v. Bellamy*, 436 F.2d 542 (2d Cir.), *cert. denied*, 402 U.S. 929, 91 S.Ct. 1523, 28 L.Ed.2d 862 (1971); *United States v. Costello*, 381 F.2d 698 (2d Cir. 1967), and that the suspect fit the profile of Zea's customers, all supported a very *strong* suspicion that the suspect had engaged in a narcotics transaction and was in possession of narcotics. While as the majority notes, the "profile" factor has been previously considered by this Court relevant only in the airport search context, and even there has been held insufficient alone to support either reasonable suspicion, *United States v. Buenaventura-Ariza, supra*, 615 F.2d at 37 n.16, or probable cause, *United States v. Price*, 599 F.2d 494, 500–01 (2d Cir. 1979), I believe that the "profile" was an even more reliable factor here. In the case at bar, a specific narcotics dealer was observed to deal with a type of individual who fit one general profile, Hispanic males. Concededly, here, as in the airport cases, this factor alone would be insufficient to support reasonable suspicion; however, given the facts of this case, it was an appropriate factor to consider. *See United States v. Brignoni-Ponce*, 422 U.S. 873, 885, 887, 95 S.Ct. 2574, 2582, 2583, 45 L.Ed.2d 607 (1975).

The facts presented in this case led Judge Mishler to opine that Ceballos' "possession of the small brown paper bag that he apparently acquired while inside the building in which Zea carried on her narcotics operation considered in conjunction with the time and duration of his visit may have established probable cause to believe that Ceballos was in possession of narcotics." (Dist. Ct.Op. at 10). While I believe, contrary to Judge Mishler, that the level of information possessed by the officers fell slightly short of that which is required to support probable cause, it was certainly lawful under the circumstances to detain Ceballos momenta-

rily for the purpose of limited inquiry. *Adams v. Williams, supra*, 407 U.S. at 146, 92 S.Ct. at 1923. We thus reach the point at which I part company with the majority. The majority concludes that the circumstances surrounding the stop of Ceballos made it tantamount to an arrest for which probable cause was necessary. While I noted in *United States v. Vasquez*, 612 F.2d 1338, 1345 (2d Cir. 1979), *cert. denied*, 447 U.S. 907, 100 S.Ct. 2991, 64 L.Ed.2d 857 (1980), that a "maximal intrusion" must be based on probable cause even where a defendant has not been subjected to a formal arrest, I am not of the opinion that the intrusion upon Ceballos in this case was by any means maximal. The majority states, "This is not a case . . . in which the officers politely approach an individual and ask a few questions in a minimally intrusive manner, without drawing their guns or otherwise limiting the suspect's freedom of movement." I am at a loss to understand how the majority so blithely reached the conclusion that the Fourth Amendment requires that upon approaching a suspected narcotics trafficker in an automobile on a city street late at night, law enforcement officers must act without regard to their own safety and politely accord the suspect the amenities due a citizen at a country fair.

There is no litmus test to determine whether the conduct of law enforcement officers in a given case constitutes an "arrest," as that term is used in Fourth Amendment case law, which must be supported by probable cause rather than the lesser standard of reasonable suspicion. Rather, the question to be addressed in close cases such as this is whether the "facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate." *Terry v. Ohio, supra*, 392 U.S. at 21–22, 88 S.Ct. at 1879–80 (*quoting Carroll v. United States*, 267 U.S. 132, 162, 45 S.Ct. 280, 288, 69 L.Ed. 543 (1925)). *See United States v. Brignoni-Ponce, supra*. Thus, we have stated that "[t]he greater the intrusion, the stronger

the basis for the officer's conduct must be" and that "if probable cause is lacking, the intrusion must be no greater than the circumstances require." *United States v. Orlando Vasquez*, 638 F.2d 507, 520 (2d Cir. 1980).

In the case at bar, the officers decided to stop and question Ceballos about his possible participation in a narcotics transaction after the officers had gathered sufficient information to support their strong suspicion that such a transaction had occurred. The officers followed Ceballos' car, and while he was stopped at a red light at an intersection, they blocked his progress from the front and rear. It was past 11:00 p. m. at the time of the stop and the officers cautiously approached Ceballos' automobile. A few of the officers, according to the testimony at the hearing, may have had their guns unholstered, but there was no testimony that any officer leveled his gun at Ceballos. Officer Palumbo testified that as he approached the car he saw a brown paper bag between Ceballos' legs. Ceballos was asked to get out of the car and as he did the bag fell to the ground. One of the other officers at the scene, Sgt. Colivato, then retrieved the bag which was partially opened and observed within it glassine envelopes containing white powder. At that point, the officers clearly had probable cause to believe that Ceballos was in possession of narcotics, and he was therefore properly placed under arrest. According to Officer Palumbo, only thirty seconds elapsed from the time Ceballos' car was blocked until the time the white powder was discovered and Ceballos was placed under arrest. Thus, what had begun as a lawful *Terry* stop quickly ripened into an arrest.

Clearly, the blocking of Ceballos' car under the circumstances here was not unreasonable. Considering the strong suspicion held by the officers that Ceballos was in possession of narcotics, the momentary blocking of his automobile at the intersection was reasonable and certainly preferable to a wild, reckless chase through dark city streets. Similarly, the officers' request that Ceballos step out of his car was reason-able under the circumstances. The danger to law enforcement officers' safety obviously is reduced when the driver is outside of the vehicle where his movements are in better view. Mention hardly needs to be made of the infamous role that violence has played in the illicit narcotics trade. *See United States v. Oates*, 560 F.2d 45, 62 (2d Cir. 1977). The law enforcement officials assigned to enforce our narcotics laws risk their lives daily and must be accorded sufficient latitude reasonably and lawfully to minimize the danger that incessantly confronts them. This is not a case in which one or more officers approached a suspect and ordered him out of his car at gunpoint, *see United States ex rel. Walls v. Mancusi*, 406 F.2d 505, 508–09 (2d Cir.), *cert. denied*, 395 U.S. 958, 89 S.Ct. 2099, 23 L.Ed.2d 745 (1969); *see also United States v. Ramos-Zaragosa*, 516 F.2d 141 (9th Cir. 1975); *United States v. Strickler*, 490 F.2d 378, 380 (9th Cir. 1974). To the contrary, in the case at bar, while there was testimony that a few of the officers might have had their guns unholstered, there is no indication that any of the officers pointed a gun at Ceballos prior to his arrest. It is in my opinion far from unreasonable for an officer to have his gun ready when approaching a suspect in an automobile late at night who is strongly suspected of having just engaged in a narcotics transaction and of being in possession of narcotics. *See generally United States v. Jackson*, 652 F.2d 244, 249 (2d Cir. 1981); *United States v. Thompson*, 558 F.2d 522, 524 (9th Cir. 1977), *cert. denied*, 435 U.S. 914, 98 S.Ct. 1466, 55 L.Ed.2d 504 (1978); *United States v. Coades*, 549 F.2d 1303, 1305 (9th Cir. 1977) (per curiam); *United States v. Russell*, 546 F.2d 839, 840 (9th Cir. 1976); *United States v. Diggs*, 522 F.2d 1310, 1314 (D.C.Cir.1975), *cert. denied*, 429 U.S. 852, 97 S.Ct. 144, 50 L.Ed.2d 127 (1976).

Upon all of the facts involved in this case, *see Rios v. United States*, 364 U.S. 253, 262, 80 S.Ct. 1431, 1436, 4 L.Ed.2d 1688 (1960), I would affirm the district court and hold that the stop of Ceballos was reasonable and that his subsequent arrest was properly based upon probable cause.